FILED
2023 Apr-14  PM 01:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| FIYYAZ PIRANI, TRUSTEE OF IMPERIUM IRREVOCABLE TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MEDICAL PROPERTIES TRUST, INC., MPT OPERATING PARTNERSHIP, L.P., EDWARD K. ALDAG, JR., R. STEVEN HAMNER, and J. KEVIN HANNA,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Fiyyaz Pirani, Trustee of Imperium Irrevocable Trust ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (as defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission

("SEC") filings, wire and press releases published by and regarding Medical Properties Trust, Inc. ("Medical Properties" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Medical Properties securities between July 15, 2019 and February 22, 2023, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Medical Properties, headquartered in Birmingham, Alabama, is a real estate investment trust ("REIT") that acquires and develops hospital facilities on a net lease basis. Since its formation in 2003, the Company has grown significantly and is one of the world's largest hospital owners of hospitals, reporting 444 facilities and approximately 44,000 licensed beds in 31 states across the U.S., seven countries in Europe, across Australia, and in one country in South America (*ie.*, Colombia), as of December 31, 2022.  The Company conducts substantially all of its operations through Defendant MPT Operating Partnership, L.P. ("MPT"), a Delaware limited partnership. The Company was formed as a Maryland corporation on August

27, 2003, and throughout the Class Period, its securities traded on the New York Stock Exchange ("NYSE") under the symbols "MPW."

3.     On July 15, 2019, Medical Properties announced that its operating entity, MPT, had entered into an agreement through which certain subsidiaries would invest approximately $1.55 billion in 14 acute care hospitals and two behavioral health facilities owned and operated by Prospect Medical Holdings, Inc. ("Prospect"), after which the Company would own the properties in the Prospect portfolio and lease them back to Prospect.

4.     Among the properties in the Prospect portfolio were four acute care hospitals located in Pennsylvania: Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital located in Springfield, Pennsylvania; Taylor Hospital located in Ridley Park, Pennsylvania; and Delaware County Memorial Hospital located in Drexel Hill, Pennsylvania (collectively, the "Pennsylvania Properties").

5.     As Plaintiff alleges herein, throughout the Class Period, Defendants engaged in a widespread and multifaceted scheme to conceal from investors that, contrary to the Company's public representations, its portfolio of assets were severely distressed and non-performing such that they could not make their rent payments. Defendants employed a number of "uncommercial transactions" to prop

up its non-performing assets in the short term and thereby avoid recording impairment charges.

6.     Defendants made materially false or misleading statements and/or failed to disclose, *inter alia*, that: (i) the Company masked the distressed state of its tenants through sale-leaseback arrangements which were essentially round-robin transactions in that they allowed debt-saddled tenants to meet their obligations in the short-term; (ii) the Company fraudulently transferred hundreds of millions of dollars in what amounted to a bailout of financially distressed tenants; (iii) the Company concealed its fraudulent transfers with fake construction projects with purportedly high capital expenses, despite the fact that the Company entered into "triple-net leases," which meant that its tenants were obligated to pay a significant portion of expenses, such as real estate taxes, insurance, and maintenance; and (iv) as a result, the Company's public statements, including those with respect to the Pennsylvania Properties, were materially false and misleading at the time they were made.

7.     On January 26, 2023, investors began to learn the truth about the Company's finances and operations. On that date, investigative financial research analyst Viceroy Research LLC ("Viceroy") published an extensive, deeply incriminating thirty-three-page analysis of the Company titled "Medical Properties (dis)Trust" (the "Viceroy Report"). The Viceroy Report asserted that the Company had "engaged in ***billions of dollars of uncommercial transactions*** with its tenants

and their management teams in order to mask a ***pervasive revenue round-robin scheme and/or theft***,"[1] and detailed – with specificity – four types of transactions by which "***substantial portions of cash is round-tripped back to [the Company]***." Those transactions included sale-leasebacks, cash giveaways, bailouts, and the siphoning away of money through fake expenses involving fake projects.

8.     On February 23, 2023, the concerns and conclusions exposed in the Viceroy Report were validated, and the house of cards constructed by Defendants came down. On that date, before the market opened, Medical Properties issued a press release announcing its financial and operating results for the fourth quarter and full-year ended December 31, 2022, and disclosed an impairment charge of $171 million related to the Pennsylvania Properties, as well as a $112 million write-off of unbilled rent to Prospect.

9.     Also on February 23, 2023, the Company announced that Emmett E. McLean, Medical Properties' Executive Vice President, Chief Operating Officer ("COO"), and Secretary, was stepping down, effective September 1, 2023. McLean had been with the Company for more than 20 years.

10.     On this news, the price of Medical Properties shares fell 8.7%, or $1.06, from a closing price on February 22, 2023 of $12.20 per share to a close on February 23 of $11.14 per share.  By March 1, 2023, the Company's stock had fallen 17.5%,

---

[1] Unless otherwise noted, all emphasis is added.

closing at $10.07 per share – a loss of market capitalization of in excess of *$1.25 billion*.

11.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.    Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). The headquarters for Medical Properties and MPT are located within this Judicial District, and substantial operations are carried out within this Judicial District.

15.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.    Plaintiff, as set forth in the attached Certification (Exhibit A), purchased or otherwise acquired Medical Properties securities during the Class Period, and suffered damages as a result of the violations of federal securities laws and false and/or misleading statements and/or material omissions alleged herein.

17.    Defendant Medical Properties Trust, Inc. is a Maryland corporation with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242. Medical Properties' common stock trades in an efficient market on the NYSE under the trading symbol "MPW."

18.    Defendant MPT Operating Partnership, L.P. is a Delaware limited partnership with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35424. Medical Properties conducts substantially all of its operations through MPT.

19.    Defendant Edward K. Aldag, Jr. was at all relevant times the Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of Medical Properties. Defendant Aldag co-founded the Company and has been CEO since its formation in 2003. Defendant Aldag signed Forms 10-K and 10-Q filed with the SEC during the Class Period.

20.    Defendant R. Steven Hamner was at all relevant times as the Chief Financial Officer ("CFO"), Treasurer and Acting Chief Financial Officer ("CFO"),

Executive Vice President, and director of Medical Properties. Defendant Hamner co-founded the Company and has been CFO since its formation in 2003. Defendant Hamner signed Medical Properties' Forms 10-K and 10-Q filed with the SEC during the Class Period.

21.     Defendant J. Kevin Hanna was at all relevant times the Vice President, Controller, and Chief Accounting Officer ("CAO") of Medical Properties. Defendant Hanna signed Forms 10-K and 10-Q filed with the SEC during the Class Period.

22.     Defendants Aldag, Hamner, and Hanna are referred to herein collectively as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Medical Properties' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Medical Properties' SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Medical Properties, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The

Individual Defendants are liable for the false statements and omissions pleaded herein.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

<u>**Background**</u>

24.     Incorporated in Maryland in 2003, Medical Properties is a REIT headquartered in Birmingham, Alabama. The Company's primary business strategy is to acquire and develop healthcare facilities and lease the facilities to healthcare operating companies under long-term net leases, which require the tenant to bear most of the costs associated with the property.

25.     While the majority of Medical Properties' leased assets are owned 100%, the Company owns some leased assets through joint ventures with other partners. The Company extends mortgage loans to healthcare operators collateralized by their real estate assets. In addition, it makes loans to certain of its operators through its taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used for working capital and other purposes.

26.     Additionally, Medical Properties occasionally makes noncontrolling investments in its tenants as investments in unconsolidated operating entities. These investments are typically made in conjunction with larger real estate transactions with the tenant that allow the Company to share in that tenant's profits and losses, as well as affording the Company certain minority rights and protections. The

Company's business model is to facilitate acquisitions and recapitalizations with the purported goal of "allow[ing] operators of healthcare facilities to serve their communities by unlocking the value of their real estate assets to fund facility improvements, technology upgrades, and other investments in operations."

27.    As of December 31, 2022, the Company had investments in 444 facilities and approximately 44,000 licensed beds in 31 states across the U.S., seven countries in Europe, across Australia, and in one country in South America (*ie.*, Colombia). Medical Properties conducts substantially all of its business through MPT Operating Partnership, L.P. was formed under Delaware law in 2003.

**Materially False and Misleading Statements Issued During the Class Period**

28.    The Class Period begins on July 15, 2019. On that date, Medical Properties filed with the SEC a Form 8-K that announced that on July 10, 2019, the Company had acquired 14 hospitals and behavioral health facilities in the Prospect Medical Holdings, Inc. portfolio (previously defined as the "Prospect Properties"), including the following acute care hospitals:  Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital located in Springfield, Pennsylvania; Taylor Hospital located in Ridley Park, Pennsylvania; and Delaware County Memorial Hospital located in Drexel Hill, Pennsylvania (previously defined as the "Pennsylvania Properties"). Through this transaction, MPT, as the Company's operating entity, entered into a definitive agreement whereby Medical Properties

would acquire the Prospect Properties and lease them back to Prospect, which, as the tenant, would pay the Company rent.

29.   In full, Medical Properties' July 15, 2019 Form 8-K provided as follows:

**Item 1.01. Entry into a Material Definitive Agreement.**

***Acquisition of Prospect Hospital Portfolio***

On July 10, 2019, the Operating Partnership entered into definitive agreements pursuant to which certain of its subsidiaries will invest approximately $1.55 billion in a portfolio of 14 acute care hospitals and two behavioral health facilities currently owned and operated by Prospect Medical Holdings, Inc. ("Prospect").

Under the terms of the agreements, certain subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of 11 acute care hospitals and two behavioral health facilities for an aggregate purchase price of approximately $1.4 billion. Such hospitals and facilities will then be leased back to Prospect under two separate master leases. In addition, (i) a subsidiary of the Operating Partnership will make a mortgage loan in the amount of approximately $51.3 million, secured by a first mortgage on an acute care hospital, and (ii) a subsidiary of the Company's taxable REIT subsidiary will make a term loan of approximately $112.9 million, which will mature upon the earlier of three years or the satisfaction of certain conditions. After the maturity of the term loan and upon satisfaction of certain conditions, other subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of two additional acute care hospitals, which real estate will be added to one of the master leases. The master leases, mortgage loan, and term loan will be cross-defaulted and cross-collateralized. The master leases and mortgage loan will have substantially similar terms, with 15-year fixed term subject to three extension options, plus annual increases at the greater of CPI or 2%, with a cap of 4%.

The table below sets forth pertinent details with respect to the hospitals and behavioral health facilities in the Prospect portfolio:

| Hospital | City | State | Form of Investment | Hospital Type | Licensed Beds |
|---|---|---|---|---|---|
| Southern CA Hospital at Hollywood | Los Angeles | California | Fee Simple | Acute | 100 |
| Southern CA Hospital at Van Nuys | Van Nuys | California | Fee Simple | Behavioral | 57 |
| Southern CA Hospital at Culver City | Culver City | California | Fee Simple | Acute | 420 |
| Los Angeles Community Hospital at Norwalk | Norwalk | California | Fee Simple | Acute | 50 |
| Los Angeles Community Hospital | Los Angeles | California | Fee Simple | Acute | 129 |
| Los Angeles Community Hospital at Bellflower | Bellflower | California | Fee Simple | Behavioral | 144 |
| Foothill Regional Medical Center | Tustin | California | Mortgage Loan | Acute | 177 |
| Manchester Memorial Hospital | Manchester | Connecticut | Fee Simple | Acute | 249 |
| Rockville General Hospital | Vernon | Connecticut | Fee Simple | Acute | 102 |
| Waterbury Hospital | Waterbury | Connecticut | Fee Simple | Acute | 357 |
| Crozer-Chester Medical Center | Upland | Pennsylvania | Fee Simple | Acute | 300 |
| Springfield Hospital | Springfield | Pennsylvania | Fee Simple | Acute | 25 |

| | | | | | |
|---|---|---|---|---|---|
| Taylor Hospital | Ridley Park | Pennsylvania | Fee Simple | Acute | 105 |
| Delaware County Memorial Hospital | Drexel Hill | Pennsylvania | Fee Simple | Acute | 168 |
| **Total Licensed Beds*** | | | | | 2,383 |

The agreements provide for the potential for a future purchase price adjustment of up to an additional $250.0 million based on achievement of certain performance thresholds over a three-year period. Any such adjustment will be added to the lease base upon which the Company will earn a return in accordance with the master leases.

Subject to customary closing conditions, the Company expects to consummate the transactions described above in the second half of 2019 with respect to all of the real estate other than the two properties subject to a delayed closing.

The Company intends to finance the transaction with funds from various financing arrangements, which may include borrowings under the bridge loan facility described below and revolving credit facility, proceeds from security issuances, cash on hand or a combination thereof. We cannot assure you that we will be able to successfully complete the Prospect investment on the terms described or at all.

30.     On August 1, 2019, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and six months ended June 30, 2019.  Among other things, the Company reported net income for Q2 2019 of $79.4 million (or $0.20 per diluted share), compared to $111.6 million (or $0.30 per diluted share) Q2 2018.  In addition, the

Company reported Normalized Funds from Operations ("NFFO") – a key metric for REITs – of $120.9 million, compared to $129.9 million in Q2 2018. Per share NFFO was $0.31 per diluted share in Q2 2019, compared to $0.36 per diluted share in Q2 2018.

31.     On August 9, 2019, the Company filed its quarterly report for Q2 2019 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

32.     On October 31, 2019, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended September 30, 2019.  Among other things, the Company reported net income for Q3 2019 of $89.8 million (or $0.20 per diluted share), compared to $736.0 million (or $2.00 per diluted share) in Q3 2018, resulting from $695.2 million of gains from sales that include a joint venture transaction by which MPT sold a 50% interest in a portfolio of 71 German post-acute hospitals. In addition, NFFO for Q3 2019 was $147.5 million, compared to $127.2 million in Q3 2018. Per share NFFO was $0.33 per diluted share, compared to $0.35 per diluted share in Q3 2018.

33.     On November 12, 2019, the Company filed its quarterly report for Q3 2019 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

34.     On February 6, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2019.   Among other things, the Company reported net income for the Q4 and full-year ended December 31, 2019 was $130 million ($0.26 per diluted share), and $375 million ($0.87 per diluted share), respectively, compared to $78 million ($0.21 per diluted share) and $1.02 billion ($2.76 per diluted share) in the year earlier periods. In addition, NFFO for Q4 and year ended December 31, 2019 was $171 million ($0.35 per diluted share), and $557 million ($1.30 per diluted share), respectively, compared to $112 million ($0.31 per diluted share) and $501 million ($1.37 per diluted share) in the year earlier periods. The year earlier period included gains on sales approximating $671 million.

35.     On February 27, 2020, the Company filed its Annual Report for 2019 on Form 10-K, which reported, *inter alia*, the financial results contained in the preceding paragraph. The 2019 10-K further represented that:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of

a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. ***We do not believe that the value of any of our facilities was impaired at December 31, 2019***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

36.     On April 30, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended March 31, 2020.  Among other things, the Company reported net income for the Q1 2020 of $81.0 million (or $0.15 per diluted share), compared to $75.8 million ($0.20 per diluted share) in Q1 2019. In addition, NFFO for Q1 2020 was $191.2 million (or $0.37 per diluted share), compared to $117.8 million ($0.31 per diluted share) in Q1 2019.

37.     On May 11, 2020, the Company filed its quarterly report for Q1 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

38.     On July 30, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended June 30, 2020.  Among other things, the Company reported net income Q2 2020 of $109.5 million (or $0.21 per diluted share), compared to $79.4 million ($0.20 per diluted share) in Q2 2019. In addition, NFFO for Q2 2020 was $199.6 million (or $0.38 per diluted share), compared to $120.9 million ($0.31 per diluted share) in Q2 2019.

39.     On August 7, 2020, the Company filed its quarterly report for Q2 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

40.     On October 29, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended September 30, 2020.  Among other things, the Company reported net income for Q3 2020 of $131.1 million (or $0.25 per diluted share), compared to $89.8 million ($0.20 per diluted share) in Q3 2019. In addition, NFFO for Q3 2020 was $220.7 million (or $0.41 per diluted share), compared to $147.5 million ($0.33 per diluted share) in Q3 2019.

41.     On November 9, 2020, the Company filed its quarterly report for Q3 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

42.     On February 4, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2020.  Among other things, the Company reported net income for Q4 and year-end 2020 of $110 million (or $0.20 per diluted share) and $431 million ($0.81 per diluted share), respectively, compared to $130 million (or $0.26 per diluted share) and $375 million ($0.87 per diluted share) in the year earlier periods. In addition, NFFO for Q4 and year-end 2020 was

$220 million ($0.41 per diluted share) and $831 million ($1.57 per diluted share), respectively, compared to $171 million ($0.35 per diluted share) and $557 million ($1.30 per diluted share) in the year earlier periods.

43.     On March 1, 2021, the Company filed its Annual Report for 2020 on Form 10-K, which reported, *inter alia*, the financial results contained in the preceding paragraph. The 2020 Form 10-K further represented as follows:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that the value of any of our facilities was impaired at December 31, 2020***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

44.     On April 29, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended March 31, 2021.  Among other things, the Company reported net income for Q1 2021 of $164 million (or $0.28 per diluted share) compared to $81 million (or $0.15

per diluted share) in the year earlier period. In addition, NFFO for the Q1 2021 was $244 million ($0.42 per diluted share) compared to $191 million ($0.37 per diluted share) in the year earlier period.

45.     On May 10, 2021, the Company filed its quarterly report for Q1 2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

46.     On July 29, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended June 30, 2021.  Among other things, the Company reported net income for Q2 2021 of $115 million (or $0.19 per diluted share) compared to $109 million (or $0.21 per diluted share) in the year earlier period. In addition, NFFO for Q2 2021 was $251 million ($0.43 per diluted share) compared to $200 million ($0.38 per diluted share) in the year earlier period.

47.     On August 9, 2021, the Company filed its quarterly report for Q2 2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

48.     On October 28, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended September 30, 2021.  Among other things, the Company reported net income for Q3 2021 of $171 million (or $0.29 per diluted share) compared to

$131 million (or $0.25 per diluted share) in the year earlier period. In addition, NFFO for the Q3 2021 was $263 million ($0.44 per diluted share) compared to $221 million ($0.41 per diluted share) in the year earlier period.

49.     On November 9, 2021, the Company filed its quarterly report for Q3 2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

50.     On February 3, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2021.  Among other things, the Company reported net income for Q4 and year-end 2021 of $207 million ($0.34 per diluted share) and $656 million ($1.11 per diluted share), respectively, compared to $110 million ($0.20 per diluted share) and $431 million ($0.81 per diluted share) in the year earlier periods. In addition, NFFO for Q4 and year-end 2021 was $279 million ($0.47 per diluted share) and $1,036 million ($1.75 per diluted share), respectively, compared to $220 million ($0.41 per diluted share) and $831 million ($1.57 per diluted share) in the year earlier periods.

51.     On March 1, 2022, the Company filed its Annual Report for 2021 on Form 10-K, which reported, *inter alia*, the financial results contained in the preceding paragraph. Further, the 2021 10-K represented as follows:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the

facility's carrying value. The review of the recoverability is generally based on our estimate of the future undiscounted cash flows from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as expected future operating income, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that any of our facilities were impaired at December 31, 2021***; however, given the highly specialized aspects of our properties, no assurance can be given that future impairment charges will not be taken.

52.    On April 28, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended March 31, 2022.  Among other things, the Company reported net income for Q1 2022 of $632 million ($1.05 per diluted share) compared to $164 million ($0.28 per diluted share) in the year earlier period. In addition, NFFO for Q1 2022 was $282 million ($0.47 per diluted share) compared to $244 million ($0.42 per diluted share) in the year earlier period, a 12% increase on a per share basis.

53.    On May 10, 2022, the Company filed its quarterly report for Q1 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

54.     On August 3, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended June 30, 2022.  Among other things, the Company reported net income for Q2 2022 of $190 million ($0.32 per diluted share) compared to $115 million ($0.19 per diluted share) in the year earlier period. In addition, NFFO for Q2 2022 was $275 million ($0.46 per diluted share) compared to $251 million ($0.43 per diluted share) in the year earlier period, a 7% increase on a per share basis.

55.     On August 9, 2022, the Company filed its quarterly report for Q2 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

56.     On October 27, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results quarter ended September 30, 2022.  Among other things, the Company reported net income for Q3 2022 of $222 million ($0.37 per diluted share) compared to $171 million ($0.29 per diluted share) in the prior year period. In addition, NFFO for Q3 2022 was $272 million ($0.45 per diluted share) compared to $263 million ($0.44 per diluted share) in the prior year period.

57.     On November 9, 2022, the Company filed its quarterly report for Q3 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

58.    These statements were materially false or misleading statements and/or failed to disclose material facts, including, *inter alia*, that: (i) the Company masked the distressed state of its tenants through sale-leaseback arrangements which were essentially round-robin transactions in that they allowed debt-saddled tenants to meet their obligations in the short-term; (ii) the Company fraudulently transferred hundreds of millions of dollars in what amounted to a bailout of financially distressed tenants; (iii) the Company concealed its fraudulent transfers with fake construction projects with purportedly high capital expenses, despite the fact that the Company entered into "triple-net leases," which meant that its tenants were obligated to pay a significant portion of expenses, such as real estate taxes, insurance, and maintenance; and (iv) as a result, the Company's public statements, including those with respect to the Pennsylvania Properties, were materially false and misleading at the time they were made.

### The Truth Emerges

59.    On January 26, 2023, the true state of Medical Properties' finances and operations began to be revealed. On that date, Viceroy Research published an extensive report on the Company (previously defined as the "Viceroy Report"). The Viceroy Report, titled "Medical Properties (dis)Trust," accused Defendants of engaging in "***billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin***

*scheme and/or theft*." The Report identified four separate – though occasionally overlapping – types of "uncommercial transactions" by which Defendants "round-tripped" cash back to the Company, the result of which was that the Company's assets, including the Pennsylvania Properties and other Prospect Properties, were "massively overstated." Defendants engaged in this scheme in order to conceal from investors the fact that "*substantially all of [Medical Properties'] major tenants appear distressed*."

60.     Sale-Leaseback: As noted above, Viceroy detailed four types of transactions necessary to Defendants' scheme of duping the market into believing that the Company's assets were healthy, performing, rent-paying tenants. The sale-leaseback was a critical component of this fraud. The Company generally acquired properties on leaseback terms such that the seller of the asset becomes the tenant. In many instances, the counterparty to these transactions is distressed. As the Viceroy Report explains, Medical Properties "appear[s] to constantly overpay for fire sale assets, sometimes by as much as 10x, which in turn allow debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term." According to Viceroy, the Company has engaged in billions of dollars of uncommercial sale-leaseback transactions to prop up a non-performing (*ie.*, non-rent-paying) asset.

61.   <u>Cash Giveaways</u>: The Viceroy Report alleges that Medical Properties "engages in various transactions with a common cast of friends in which hundreds of millions of dollars go missing. [The Company] has disappeared hundreds of millions of dollars in what appear to be fraudulent transactions." Here, the value of the underlying asset is only a fraction of the value of the transaction. Yet only a fraction of the consideration to be paid is actually received by the vendor because it appears that "a middle-man" brokers the transaction and keeps a portion of the consideration. According to Viceroy, the use of these brokers allows money to be siphoned off unaccounted for.

62.   <u>Bailouts</u>: The third type of transaction employed by Defendants is a "run-of-the-mill bailout transaction." According to Viceroy, the Company has spent hundreds of millions of dollars bailing out distressed tenants. Medical Properties may acquires equity in a failing tenant or issue the tenant a loan in order to mast uncollectable rent through what is essentially the round-tripping of revenues. These bailouts allowed the Company to avoid recording an impairment for distressed assets.

63.   <u>Capex Assistance and Fake Builds</u>: Lastly, the Viceroy Report details a practice whereby the Company will "collude" with a tenant to fabricate fake projects in order to hide money in phony expenses. According to the Report:

- Various of MPW's ongoing developments appear to be either non-existent or have not broken ground. Despite this, MPW claim to have

spent tens of millions of dollars on each development. Site visits of barren construction sites and local news sources suggest this is a lie.

- MPW's tenants are exclusively on triple-net leases, meaning they are on the hook for real estate taxes, insurance, and maintenance. Despite this, various filings and MPW's financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its distressed tenants.

Thus, in order to conceal the disappearance of cash – cash that was needed to effect a bailout or another uncommercial transaction – Defendants invented costs and expenses that did not exist.

64.    The extensive research and analysis undertaken by Viceroy led it to the conclusion that Medical Properties' assets were "massively overstated" and that, simply put, "[the Company] is a subprime asset rolled-up generating prime yields." Included in the Viceroy Report's "Key Takeaways" are as follows:

▪ MPW has engaged in ***billions of dollars of uncommercial transactions*** with its tenants and their management teams in order to mask a ***pervasive revenue round-robin scheme and / or theft***.

▪ The value of MPW's assets, as a result of capitalizing these uncommercial transactions, are ***massively overstated***.

▪ MPW engaged in an aggressive, debt-fuelled [sic] roll-up strategy in order to affect these transactions. ***We believe the true value of MPW's LTV is ~85%, creating enormous credit risk***.

▪ Many of MPW's tenants are severely distressed. This precedes the need to engage in revenue round-robin transactions.

▪ ***Financial accounting gimmicks ensure MPW's management are incentivized to continue engaging in uncommercial transactions and possible fraud***. These align with management incentive schemes.

65.     On February 23, 2023, Medical Properties disclosed its Q4 2022 and year-end 2022 financial results, which lent credence to the concerns raised in the Viceroy Report. The Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2022. The Company disclosed that operating results for Q4 and year-end 2022 were a net loss of ($140) million (($0.24) per diluted share) and net income of $903 million ($1.50 per diluted share), respectively, compared to net income of $207 million ($0.34 per diluted share) and $656 million ($1.11 per diluted share) in the year earlier periods. NFFO for Q4 and year-end 2022 was $258 million ($0.43 per diluted share) and $1,088 million ($1.82 per diluted share), respectively, compared to $279 million ($0.47 per diluted share) and $1,036 million ($1.75 per diluted share) in the year earlier periods.

66.     In addition, in connection with the Q4 and year-end 2022 results, the Company surprised investors by disclosing that it was recording an ***impairment charge of $171 million relating to the Pennsylvania Properties*** and a ***write-off of an additional $112 million on unbilled rent to Prospect***. Specifically, the Company stated that:

> [f]ourth quarter 2022 net loss and full-year 2022 net income included a real estate impairment of approximately ***$171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania*** as well as a write-off of roughly ***$112 million in unbilled Prospect rent*** also included in Funds from Operations ("FFO") but excluded from normalized results.

67.     Also on February 23, 2023, Medical Properties revealed that its long-time COO and Executive Vice President, Emmett E. McLean, was retiring, effective September 1, 2023.

68.     The disclosure of this corrective information, previously concealed to the market, cost investors dearly. Shares of Medical Properties declined 8.7%, falling $1.06 per share, from a February 22, 2023 closing price of $12.20 per share to a close on February 23 of $11.14 per share. Company shares continued to lose their value, and by March 1, 2023, the share price closed at $10.07 – a total decline of *17.5%*. All told, Medical Properties suffered a market capitalization loss of more than *$1.25 billion*.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Medical Properties common stock during the Class Period, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

70.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Medical Properties securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Medical Properties or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period, misrepresented material facts about the business, operations and management of Medical Properties;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Medical Properties securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

74. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

75. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Medical Properties securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Medical Properties securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

76.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

77.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

78.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Medical Properties securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Medical Properties securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Medical

Properties securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Medical Properties' finances and business prospects.

82.     By virtue of their positions at Medical Properties, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Medical Properties, the Individual Defendants had knowledge of the details of Medical Properties' internal affairs.

84.     Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, Defendants were able to and did, directly or indirectly, control the content of the

statements of Medical Properties. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Medical Properties' businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Medical Properties' securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Medical Properties' business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Company securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

85.     During the Class Period, Medical Properties securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Medical Properties securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or

otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Medical Properties securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Medical Properties securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

88.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.    During the Class Period, the Individual Defendants participated in the operation and management of Medical Properties, and conducted and participated,

directly and indirectly, in the conduct of Medical Properties' business affairs. Because of their senior positions, they knew the adverse non-public information about Medical Properties' misstatement of income and expenses and false financial statements.

90.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Medical Properties' financial condition and results of operations, and to correct promptly any public statements issued by Medical Properties which had become materially false or misleading.

91.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Medical Properties disseminated in the marketplace during the Class Period concerning Medical Properties' results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Medical Properties to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Medical Properties within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Medical Properties securities.

92.     Each of the Individual Defendants, therefore, acted as a controlling person of Medical Properties. By reason of their senior management positions and/or being directors of Medical Properties, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Medical Properties to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Medical Properties and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Medical Properties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated: April 13, 2023                Respectfully submitted,

*/s/ Jon Mann*
Chris T. Hellums (ASB-5583-L73C)
Jonathan S. Mann (ASB-1083-A36M)
**PITTMAN, DUTTON, HELLUMS,**
**BRADLEY & MANN P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
Email: chrish@pittmandutton.com
Email: jonm@pittmandutton.com

Sherrie R. Savett (*pro hac vice forthcoming*)
Michael Dell'Angelo (*pro hac vice forthcoming*)
Andrew Abramowitz (*pro hac vice forthcoming*)
James Maro (*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: ssavett@bm.net
Email: mdellangelo@bm.net

Email: aabramowitz@bm.net
Email: jmaro@bm.net

*Attorneys for Plaintiff and the Proposed
Class*

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:**

Medical Properties Trust, Inc.
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

MPT Operating Partnership, L.P.
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, AL 36104

Edward K. Aldag, Jr.
1000 Urban Center Drive, Suite 501
Birmingham, AL 35242

J. Kevin Hanna
1000 Urban Center Drive, Suite 501
Birmingham, AL 35242

R. Steven Hamner
1000 Urban Center Drive, Suite 501
Birmingham, AL 35242