FILED
2023 Sep-22  PM 04:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| FIYYAZ PIRANI, TRUSTEE OF IMPERIUM IRREVOCABLE TRUST, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MEDICAL PROPERTIES TRUST, INC.; MPT OPERATING PARTNERSHIP, L.P.; EDWARD K. ALDAG, JR.; R. STEVEN HAMNER; and J. KEVIN HANNA, <br><br> Defendants. | Case No. 2:23-cv-00486-CLM <br><br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION .................................................................... 1

JURISDICTION AND VENUE ................................................................ 7

PARTIES ................................................................................................... 8

SUBSTANTIVE ALLEGATIONS ......................................................... 10

    A.    Background ................................................................... 10

    B.    Materially False and Misleading Statements Issued
            During the Class Period ............................................... 13

    C.    The Truth Emerges ...................................................... 26

            1.    The Viceroy Report .......................................... 26

            2.    Medical Properties' Announcement of a $283 Million
                  Impairment Charge Related to Prospect and the
                  Pennsylvania Properties .................................... 34

    D.    Defendants' Misconduct .............................................. 37

            1.    Defendants Knew of Financial Problems at Prospect
                  and the Pennsylvania Properties Long Before Recording
                  the Q4 2022 Impairment Charge ...................... 37

            2.    GAAP Governing Impaired Lease Assets Required
                  Defendants to Analyze the Information They Ignored
                  Regarding Prospect's Financial Condition .............. 52

            3.    Defendants Violated Regulation S-K Item 303 by Failing
                  to Disclose Known Trends and Uncertainties Regarding
                  Anticipated Lease Payment Shortfalls ..................... 55

            4.    The Individual Defendants Had a Motive to Misstate
                  the Company's Financial Statements to Maximize
                  Their Bonuses, Stock Awards, and Value of Their
                  Aggregate Stock Holdings ...................................... 59

i

SUMMARY OF SCIENTER ALLEGATIONS......................................................64

    A.    The Individual Defendants Were Entitled to Receive
Substantial Performance Based Compensation Based on
the Company's Net Earnings and Volume of Acquisitions
Which, Absent Defendants' Alleged Misconduct, Would
Have Been Substantially Reduced or Lost Entirely............................66

    B.    The Findings by the Rhode Island Attorney General
Are Strongly Indicative of Scienter......................................................67

    C.    Several Third Party Observers Criticized the
Company's Use of Round-Trip Transactions to Help
Tenants Make Rent Payments..............................................................67

    D.    The Size and Timing of the $283 Million Impairment
Charge Support a Strong Inference of Scienter....................................68

    E.    Leadership Changes at Medical Properties Further
Support a Strong Inference of Scienter.................................................69

LOSS CAUSATION........................................................................................69

APPLICABILITY OF THE PRESUMPTION OF RELIANCE............................71

CLASS ACTION ALLEGATIONS ...................................................................73

NO SAFE HARBOR .......................................................................................77

COUNT I Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder (Against All Defendants) ................................................77

COUNT II Violations of Section 20(a) of the Exchange Act (Against the
Individual Defendants)..............................................................................................80

PRAYER FOR RELIEF ..................................................................................83

JURY TRIAL DEMAND .................................................................................84

Plaintiff Fiyyaz Pirani, Trustee of Imperium Irrevocable Trust ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Lead Counsel for the proposed Class, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and on information and belief as to all other matters. The allegations herein are based on an investigation conducted by Lead Counsel that included, among other things, an analysis of filings by Medical Properties Trust, Inc. ("Medical Properties" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases published by the Company, earnings call transcripts, analysts' reports, news reports, and other public information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of a proposed class consisting of all persons and entities that purchased or otherwise acquired Medical Properties securities between July 15, 2019 and February 22, 2023, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Medical Properties, headquartered in Birmingham, Alabama, is a real estate investment trust ("REIT"). The Company acquires and develops hospital

1

facilities on a "net lease" basis, meaning it owns the buildings and land and leases the facilities to medical providers. Since its formation in 2003, the Company has grown significantly and is one of the world's largest owners of hospital buildings. The Company reported a portfolio of 444 facilities that hold 44,000 licensed beds in 31 states across the U.S., seven countries in Europe, across Australia, and in Columbia, South America, as of December 31, 2022.

3.     Medical Properties conducts substantially all of its operations through Defendant MPT Operating Partnership, L.P. ("MPT"), a Delaware limited partnership.

4.     Throughout the Class Period, Medical Properties' securities traded on the New York Stock Exchange ("NYSE") under the symbol "MPW."

5.     On July 15, 2019, the first day of the Class Period, Medical Properties announced that it entered into an agreement to acquire fourteen acute care hospitals and two behavioral health facilities owned and operated by Prospect Medical Holdings, Inc. ("Prospect") for a purchase price of $1.55 billion. After the purchase, Medical Properties would own the properties in the Prospect portfolio and lease them back to Prospect, as is typical in Medical Properties' sale-leaseback transactions.

6.     Among the properties in the Prospect portfolio were four hospitals located in Pennsylvania: Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital in Springfield, Pennsylvania; Taylor Hospital in Ridley Park,

Pennsylvania; and Delaware County Memorial Hospital in Drexel Hill, Pennsylvania (collectively, the "Pennsylvania Properties").

7.     As Plaintiff alleges herein, throughout the Class Period, Defendants engaged in a multifaceted scheme to **conceal from investors that, contrary to the Company's public representations, its portfolio of facilities was severely distressed and non-performing such that many of the medical provider tenants could not make their lease payments**. To mask the weaknesses in its portfolio, Defendants employed a number of "uncommercial transactions," which were transactions with little or no legitimate commercial purpose that were used to route cash and other financial assistance to struggling tenants so they could in turn continue to make lease payments to the Company. A key purpose of the uncommercial transactions was to help tenants make steady lease payments to avoid the need for the Company to record impairment charges that would decrease the Company's net income and other financial metrics. Masking rent shortfalls was also critical to avoid portraying cracks in the Company's portfolio to the market.

8.     Throughout the Class Period, Defendants made materially false and misleading statements, and/or failed to disclose, *inter alia*, that: (i) many of its tenants were financially distressed and could not make their scheduled lease payments; (ii) the Company masked the distressed state of its tenants by utilizing "uncommercial transactions," which were essentially round-trip transactions that allowed tenants to

meet their lease payment obligations in the short-term; (iii) the Company's tactics were used to avoid recording asset impairment charges and write-offs of rent receivables that were otherwise required; (iv) the Company intentionally delayed recording a $283 million impairment charge related to Prospect and the Pennsylvania Properties, which was belatedly recorded at the end of the Class Period; and (v) the Company failed to record needed impairment charges with respect to other tenants beyond Prospect and the Pennsylvania Properties. As a result of these issues, the Company's financial statements and SEC filings were materially false and misleading throughout the Class Period.

9.      During the Class Period, investors belatedly began to learn the truth about the Company's finances and operations. For example, on January 26, 2023, investigative financial research firm Viceroy Research LLC ("Viceroy") published an extensive thirty-three page analysis of the Company titled "Medical Properties (dis)Trust" (the "Viceroy Report"). The Viceroy Report noted that the Company "engaged in ***billions of dollars of uncommercial transactions with its tenants . . . in . . . a pervasive revenue round-robin scheme***."[1] The Viceroy Report detailed four types of transactions by which "***substantial portions of cash is round-tripped back to [Medical Properties]***" to create an illusion of positive payment histories from distressed tenants to avoid the need for impairment charges. The uncommercial

---

[1] Unless otherwise noted, all emphasis in quotes throughout this Complaint is added.

transactions included sale-leasebacks, cash giveaways, bailouts, and the transfer of funds to tenants through fake construction and maintenance projects, as discussed more fully below. The issues raised in the Viceroy Report were a component of the larger overarching problem at Medical Properties: the concealment of the then-existing fact that many of the Company's tenants were severely distressed and that impairment charges were required during the Class Period.

10.     Viceroy's conclusion about the Company using unwarranted round-trip transactions to boost tenants' rent payments was consistent with previous reporting by sources including *The Wall Street Journal*, as discussed below.

11.     The Individual Defendants and other Medical Properties executives had a financial motive to engage in the wrongdoing alleged herein. The Individual Defendants and other executives received performance-based compensation that significantly exceeded their non performance-based compensation each year during the Class Period. The Company's performance-based compensation plan was tied largely to the Company's net earnings, which were inflated due to Defendants' failure to record necessary impairment charges. The performance-based compensation plan was also tied to the volume of acquisitions the Company made each year, providing an incentive for executives to seek and/or approve acquisitions of hospital facilities even where the operators of the hospitals were distressed and were unlikely to make their lease payments on a long-term basis.

12.    On February 23, 2023, the house of cards constructed by Defendants began to crumble. On that date, before the market opened, Medical Properties issued a press release announcing its financial results for the fourth quarter and full-year ended December 31, 2022. The press release disclosed that the Company was recording a ***$283 million impairment charge consisting of: (i) a $171 million write-down of assets related to the Pennsylvania Properties, and (ii) a $112 million write-off of unbilled rent owed by Prospect***.

13.    On this news, the price of Medical Properties common stock fell by 8.7%, or $1.06, from a closing price of $12.20 per share on February 22, 2023 to a close of $11.14 per share on February 23, 2023. By March 1, 2023, the Company's stock price had fallen 17.5%, closing at $10.07 per share – a loss of market capitalization of in excess *of **$1.25 billion***.

14.    The impairment charge should have been recorded much sooner during the Class Period. Defendants were well aware of ongoing financial problems at Prospect and the Pennsylvania Properties throughout the Class Period, as discussed below. Prospect was the Company's third-largest tenant and was one of only three tenants to each contribute more than 10% of Medical Properties' revenue in 2020, 2021, and 2022. Given the importance of Prospect to Medical Properties' overall financial results, Defendants had a heightened duty to keep a close watch on Prospect's financial status and ability to pay rent.

15.    Defendants also failed to record impairment charges related to other tenants beyond Prospect and the Pennsylvania Properties.

16.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the truth emerged, Plaintiff and other Class members have suffered compensable damages.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Among other things, the headquarters of Medical Properties and MPT are located within this Judicial District, and substantial operations are carried out within this Judicial District.

20.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

21.     Plaintiff purchased or otherwise acquired Medical Properties securities during the Class Period and suffered damages as a result of the violations of federal securities laws and false and misleading statements and/or omissions alleged herein. Plaintiff's transactions in Medical Properties securities are set forth in its previously filed Certification (Dkt. 6-1).

22.     Defendant Medical Properties Trust, Inc. is a Maryland corporation with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242. Medical Properties' common stock trades in an efficient market on the NYSE under the trading symbol "MPW."

23.     Defendant MPT Operating Partnership, L.P. is a Delaware limited partnership with principal executive offices located at 1000 Urban Center Drive, Suite 501, Birmingham, Alabama 35242. Medical Properties conducts substantially all of its operations through MPT.[2]

24.     Defendant Edward K. Aldag, Jr. was at all relevant times the Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of Medical Properties. Defendant Aldag co-founded the Company and has been its CEO

---

[2] The Company's Forms 10-K and 10-Q throughout the Class Period were filed jointly in the names of Medical Properties Trust, Inc. and MPT Operating Partnership, L.P. Plaintiff herein refers to the 10-Ks and 10-Qs as having been filed by the Company or Medical Properties for ease of reference.

since its formation in 2003. Defendant Aldag signed two Certifications attached to each Form 10-K and 10-Q filed with the SEC throughout the Class Period: (i) a Sarbanes-Oxley Certification stating that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," and (ii) a Certification pursuant to Rule 13a-14(a) of Securities Exchange Act of 1934 stating that, among other things, "this report does not contain any untrue statement of a material fact or omit to state a [necessary] material fact."

25.     Defendant R. Steven Hamner was at all relevant times the Chief Financial Officer ("CFO"), Treasurer, Executive Vice President, and a Director of Medical Properties. Defendant Hamner co-founded the Company and has been its CFO since its formation in 2003. Defendant Hamner signed two Certifications attached to each Form 10-K and 10-Q filed with the SEC throughout the Class Period: (i) a Sarbanes-Oxley Certification stating that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," and (ii) a Certification pursuant to Rule 13a-14(a) of Securities Exchange Act of 1934 stating that, among other things, "this report does not contain any untrue statement of a material fact or omit to state a [necessary] material fact."

26.     Defendant J. Kevin Hanna was at all relevant times the Vice President, Controller, and Chief Accounting Officer ("CAO") of Medical Properties. Defendant

Hanna signed all Forms 10-K and 10-Q filed with the SEC throughout the Class Period.

27.    Defendants Aldag, Hamner, and Hanna are collectively referred to herein as the "Individual Defendants."

28.    The Individual Defendants possessed the power and authority to control the contents of Medical Properties' SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Medical Properties' SEC filings and press releases alleged herein to be misleading prior to their issuance, and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Medical Properties, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the affirmative representations being made were materially false and misleading when made. The Individual Defendants are liable for the false statements and omissions alleged herein.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

29.    Incorporated in Maryland in 2003, Medical Properties is a REIT headquartered in Birmingham, Alabama. The Company's primary business strategy is to acquire and develop healthcare facilities and lease the facilities to healthcare

operating companies under long-term leases. The leases are generally "net leases," meaning they require the tenant to bear most of the costs associated with the property.

30.     While the majority of the Company's leased facilities are owned 100% by the Company, it also owns some leased properties through joint ventures with other partners.

31.     Medical Properties occasionally extends mortgage loans to healthcare operators collateralized by the underlying real estate assets. In addition, the Company occasionally makes loans to certain healthcare operators through the Company's taxable REIT subsidiaries ("TRS"), the proceeds of which are typically used by the operators for working capital and other purposes.

32.     Medical Properties occasionally makes noncontrolling investments in its tenants as investments in unconsolidated operating entities. These investments, which provide a cash infusion to the tenants, are typically made in conjunction with larger real estate transactions with the tenants. The investments often take the form of purchases of stock or other securities of the operating entities. The investments allow the Company to share in the tenants' profits and losses, as well as afford the Company certain minority rights and protections.

33.     As of December 31, 2022, the Company's portfolio consisted of 444 facilities that hold 44,000 licensed beds in 31 states across the U.S., seven countries in Europe, across Australia, and in Columbia, South America.

34.     The Company's 10-Ks, 10-Qs, and earnings releases issued throughout the Class Period placed particular emphasis on key financial metrics including net income, "funds from operations" (referred to as "FFO"), and "normalized funds from operations" (referred to "NFFO"). FFO is a metric that begins with net income and backs out: (i) gains or losses on sales of real estate, (ii) impairment charges on certain assets, (iii) depreciation and amortization expense, and (iv) income or loss attributed to unconsolidated partnerships and joint ventures. NFFO begins with FFO and backs out financial results from: (i) unanticipated or non-core corporate events, and (ii) accounting changes.

35.     Medical Properties defined FFO and NFFO as follows:

Investors and analysts following the real estate industry utilize funds from operations, or FFO, as a supplemental performance measure. FFO, reflecting the assumption that real estate asset values rise or fall with market conditions, principally adjusts for the effects of GAAP depreciation and amortization of real estate assets, which assumes that the value of real estate diminishes predictably over time. We compute FFO in accordance with the definition provided by the National Association of Real Estate Investment Trusts, or Nareit, which represents net income (loss) (computed in accordance with GAAP), excluding gains (losses) on sales of real estate and impairment charges on real estate assets, plus real estate depreciation and amortization and after adjustments for unconsolidated partnerships and joint ventures.

In addition to presenting FFO in accordance with the Nareit definition, we disclose normalized FFO [NFFO], which adjusts FFO for items that relate to unanticipated or non-core events or activities or accounting changes that, if not noted, would make comparison to prior period results and market expectations less meaningful to investors and analysts.

We believe that the use of FFO . . . improves the understanding of our operating results among investors and the use of normalized FFO makes comparisons of our operating results with prior periods and other companies more meaningful. . . . FFO and normalized FFO are relevant and widely used supplemental measures of operating and financial performance of REITs . . . . [T]he measures do not reflect either depreciation and amortization costs or the level of capital expenditures and leasing costs necessary to maintain the operating performance of our properties, which can be significant economic costs that could materially impact our results of operations.[3]

36.     Defendants' wrongful conduct caused the Company's net income, FFO, and NFFO, among other financial figures, to be overstated throughout the Class Period. Defendants' conduct also caused the value of real estate assets (*e.g.*, leased property and rent receivables) on the Company's balance sheet to be overstated because necessary impairment charges and write-offs were not recorded, and some were intentionally delayed until the fourth quarter of 2022. Defendants also failed to disclose the fact that many of its tenants were struggling financially and that the Company was using its own cash to provide assistance to tenants so they could in turn make rent payments back to the Company. Masking rent shortfalls was critical to avoid impairment charges, write-offs of rent receivables, and portraying cracks in the Company's portfolio to the market.

**B.     Materially False and Misleading Statements Issued During the Class Period**

37.     The Class Period begins on July 15, 2019. On that date, Medical

---

[3] *See, e.g.*, Form 10-K for the year ended December 31, 2021 at 48.

13

Properties filed with the SEC a Form 8-K announcing that on July 10, 2019, the Company entered into agreements to acquire fourteen hospitals and behavioral health facilities in the Prospect Medical Holdings, Inc. portfolio (previously defined as the "Prospect Properties"), including four hospitals located in Pennsylvania: Crozer-Chester Medical Center in Upland, Pennsylvania; Springfield Hospital in Springfield, Pennsylvania; Taylor Hospital in Ridley Park, Pennsylvania; and Delaware County Memorial Hospital in Drexel Hill, Pennsylvania (previously defined as the "Pennsylvania Properties"). Through this transaction, MPT, as the Company's operating entity, entered into a definitive agreement whereby Medical Properties would acquire the Prospect Properties and lease them back to Prospect which, as the tenant, would pay rent to the Company over a fifteen-year lease term.

38.    The July 15, 2019 Form 8-K described the Prospect transaction as follows, in relevant part:

### Acquisition of Prospect Hospital Portfolio

On July 10, 2019, the Operating Partnership entered into definitive agreements pursuant to which certain of its subsidiaries will invest approximately $1.55 billion in a portfolio of 14 acute care hospitals and two behavioral health facilities currently owned and operated by Prospect Medical Holdings, Inc. ("Prospect").

Under the terms of the agreements, certain subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of 11 acute care hospitals and two behavioral health facilities for an aggregate purchase price of approximately $1.4 billion. Such hospitals and facilities will then be leased back to Prospect under two separate master leases. In addition, (i) a subsidiary of the Operating

14

Partnership will make a mortgage loan in the amount of approximately $51.3 million, secured by a first mortgage on an acute care hospital, and (ii) a subsidiary of the Company's taxable REIT subsidiary will make a term loan of approximately $112.9 million, which will mature upon the earlier of three years or the satisfaction of certain conditions. After the maturity of the term loan and upon satisfaction of certain conditions, other subsidiaries of the Operating Partnership will acquire from Prospect all of its interests in the real estate of two additional acute care hospitals, which real estate will be added to one of the master leases. The master leases, mortgage loan, and term loan will be cross-defaulted and cross-collateralized. The master leases and mortgage loan will have substantially similar terms, with 15-year fixed term subject to three extension options, plus annual increases at the greater of CPI or 2%, with a cap of 4%.

The table below sets forth pertinent details with respect to the hospitals and behavioral health facilities in the Prospect portfolio:

| **Hospital** | **City** | **State** | Form of Investment | Hospital Type | Licensed Beds |
|---|---|---|---|---|---|
| Southern CA Hospital at Hollywood | Los Angeles | California | Fee Simple | Acute | 100 |
| Southern CA Hospital at Van Nuys | Van Nuys | California | Fee Simple | Behavioral | 57 |
| Southern CA Hospital at Culver City | Culver City | California | Fee Simple | Acute | 420 |
| Los Angeles Community Hospital at Norwalk | Norwalk | California | Fee Simple | Acute | 50 |
| Los Angeles Community Hospital | Los Angeles | California | Fee Simple | Acute | 129 |
| Los Angeles Community Hospital at Bellflower | Bellflower | California | Fee Simple | Behavioral | 144 |
| Foothill Regional Medical Center | Tustin | California | Mortgage Loan | Acute | 177 |
| Manchester Memorial Hospital | Manchester | Connecticut | Fee Simple | Acute | 249 |
| Rockville General Hospital | Vernon | Connecticut | Fee Simple | Acute | 102 |
| Waterbury Hospital | Waterbury | Connecticut | Fee Simple | Acute | 357 |
| *Crozer-Chester Medical Center* | *Upland* | *Pennsylvania* | *Fee Simple* | *Acute* | *300* |
| *Springfield Hospital* | *Springfield* | *Pennsylvania* | *Fee Simple* | *Acute* | *25* |
| *Taylor Hospital* | *Ridley Park* | *Pennsylvania* | *Fee Simple* | *Acute* | *105* |

15

| Hospital | City | State | Form of Investment | Hospital Type | Licensed Beds |
|---|---|---|---|---|---|
| *Delaware County Memorial Hospital* | *Drexel Hill* | *Pennsylvania* | *Fee Simple* | *Acute* | *168* |
| | | | | | |
| **Total Licensed Beds** | | | | | **2,383** |

. . . .

The agreements provide for the potential for a future purchase price adjustment of up to an additional $250.0 million based on achievement of certain performance thresholds over a three-year period. Any such adjustment will be added to the lease base upon which the Company will earn a return in accordance with the master leases.

Subject to customary closing conditions, the Company expects to consummate the transactions described above in the second half of 2019 with respect to all of the real estate other than the two properties subject to a delayed closing.

39.     On August 1, 2019, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended June 30, 2019 ("Q2 2019"). Among other things, the Company reported Q2 2019 net income of $79.4 million, FFO of $119.5 million, and NFFO of $120.9 million. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

40.     On August 9, 2019, the Company filed its quarterly report for Q2 2019 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

41.     On October 31, 2019, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the

quarter ended September 30, 2019 ("Q3 2019"). Among other things, the Company reported Q3 2019 net income of $89.8 million, FFO of $139.3 million, and NFFO of $147.5 million. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

42.   On November 12, 2019, the Company filed its quarterly report for Q3 2019 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

43.   On February 6, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2019 ("FY 2019"). Among other things, the Company reported FY 2019 full-year net income of $374.7 million, FFO of $535.8 million, and NFFO of $557.4 million. The Company also reported a balance of $2.1 billion in the "Investment in Financing Leases" line item on its Balance Sheet, which included the Company's real estate assets related to the Prospect leases, among other leases.[4] That line item consisted of the aggregate future "lease payments receivable" to be paid by Prospect over the life of the leases (net of certain adjustments), plus the value ("residual value") of the real estate leased to Prospect.[5] Each of these figures

---

[4] *See* Form 10-K for the year ended December 31, 2019 at pg. 81 ("We are accounting for these [Prospect] properties as a financing (as presented in the 'Investment in financing leases' line of the consolidated balance sheets) under the . . . lease accounting rules . . . .").

[5] *Id.* at pg. 85 (chart of components of Investment in Financing Leases line item).

was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

44.    On February 27, 2020, the Company filed its Annual Report for 2019 on Form 10-K ("2019 10-K"), which reported, *inter alia*, the financial results contained in the preceding paragraph. The 2019 10-K noted that the Company's acquisition of the Prospect portfolio closed on August 23, 2019. Further, the 2019 10-K discussed the Company's real estate asset impairment policy, stating in relevant part:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. ***We do not believe that the value of any of our facilities was impaired at December 31, 2019***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

45.    On April 30, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended March 31, 2020 ("Q1 2020"). Among other things, the Company reported Q1 2020 net income of $81.0 million, FFO of $168.7 million, and NFFO of $191.2 million. The Company also reported a balance of $2.1 billion in the Investment in

18

Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

46.     On May 11, 2020, the Company filed its quarterly report for Q1 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

47.     On July 30, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended June 30, 2020 ("Q2 2020"). Among other things, the Company reported Q2 2020 net income of $109.5 million, FFO of $183.9 million, and NFFO of $199.6 million. The Company also reported a balance of $2.1 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

48.     On August 7, 2020, the Company filed its quarterly report for Q2 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

49.     On October 29, 2020, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended September 30, 2020 ("Q3 2020"). Among other things, the Company

reported Q3 2020 net income of $131.1 million, FFO of $212.4 million, and NFFO of $220.7 million. The Company also reported a balance of $2.1 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

50.     On November 9, 2020, the Company filed its quarterly report for Q3 2020 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

51.     On February 4, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2020 ("FY 2020"). Among other things, the Company reported FY 2020 full-year net income of $431.5 million, FFO of $757.7 million, and NFFO of $831.2 million. The Company also reported a balance of $2.0 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

52.     On March 1, 2021, the Company filed its Annual Report for 2020 on Form 10-K ("2020 10-K"), which reported, *inter alia*, the financial results contained in the preceding paragraph. The 2020 10-K also discussed the Company's real estate asset impairment policy, stating:

When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that the value of any of our facilities was impaired at December 31, 2020***; however, given the highly specialized aspects of our properties no assurance can be given that future impairment charges will not be taken.

53.     On April 29, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended March 31, 2021 ("Q1 2021"). Among other things, the Company reported Q1 2021 net income of $163.8 million, FFO of $251.0 million, and NFFO of $243.9 million. The Company also reported a balance of $2.0 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

54.     On May 10, 2021, the Company filed its quarterly report for Q1 2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

21

55.     On July 29, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended June 30, 2021 ("Q2 2021"). Among other things, the Company reported Q2 2021 net income of $114.6 million, FFO of $205.6 million, and NFFO of $250.5 million. The Company also reported a balance of $2.0 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

56.     On August 9, 2021, the Company filed its quarterly report for Q2 2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

57.     On October 28, 2021, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended September 30, 2021 ("Q3 2021"). Among other things, the Company reported Q3 2021 net income of $171.1 million, FFO of $260.0 million, and NFFO of $262.8 million. The Company also reported a balance of $2.0 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

58.     On November 9, 2021, the Company filed its quarterly report for Q3

2021 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

59.    On February 3, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter and year ended December 31, 2021 ("FY 2021"). Among other things, the Company reported FY 2021 full-year net income of $656.0 million, FFO of $976.0 million, and NFFO of $1.0 billion. The Company also reported a balance of $2.1 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

60.    On March 1, 2022, the Company filed its Annual Report for 2021 on Form 10-K ("2021 10-K"), which reported, *inter alia*, the financial results contained in the preceding paragraph. The 2021 10-K also discussed the Company's real estate asset impairment policy, stating:

> When circumstances indicate a possible impairment of the value of our real estate investments, we review the recoverability of the facility's carrying value. The review of the recoverability is generally based on our estimate of the ***future undiscounted cash flows*** from the facility's use and eventual disposition. Our forecast of these cash flows considers factors such as ***expected future operating income***, market and other applicable trends, and residual value, as well as the effects of leasing demand, competition, and other factors. If impairment exists due to the inability to recover the carrying value of a facility on an undiscounted basis, an impairment loss is recorded to the extent that the carrying value exceeds the estimated fair value of the facility. In making estimates of fair value for purposes of impairment assessments, we will

look to a number of sources including independent appraisals, available broker data, or our internal data from recent transactions involving similar properties in similar markets. ***We do not believe that any of our facilities were impaired at December 31, 2021***; however, given the highly specialized aspects of our properties, no assurance can be given that future impairment charges will not be taken.

61.     On April 28, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended March 31, 2022 ("Q1 2022"). Among other things, the Company reported Q1 2022 net income of $631.7 million, FFO of $279.1 million, and NFFO of $282.5 million. The Company also reported a balance of $2.1 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

62.     On May 10, 2022, the Company filed its quarterly report for Q1 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

63.     On August 3, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended June 30, 2022 ("Q2 2022"). Among other things, the Company reported Q2 2022 net income of $189.6 million, FFO of $274.9 million, and NFFO of $274.7 million. The Company also reported a balance of $2.1 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated

due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

64.     On August 9, 2022, the Company filed its quarterly report for Q2 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

65.     On October 27, 2022, the Company filed a Form 8-K with the SEC, which attached a press release containing the financial and operational results for the quarter ended September 30, 2022 ("Q3 2022"). Among other things, the Company reported Q3 2022 net income of $221.8 million, FFO of $252.0 million, and NFFO of $272.3 million. The Company also reported a balance of $2.0 billion in the Investment in Financing Leases line item on its Balance Sheet. Each of these figures was overstated due to Defendants' failure to record necessary asset impairment charges and/or write-offs of rent receivables.

66.     On November 9, 2022, the Company filed its quarterly report for Q3 2022 on Form 10-Q, which reported, *inter alia*, the financial results contained in the preceding paragraph.

67.     The SEC filings discussed above were materially false and misleading, and/or failed to disclose, *inter alia*, that: (i) many of the Company's tenants were financially distressed and could not make their scheduled lease payments; (ii) the Company masked the distressed state of its tenants by utilizing uncommercial

transactions, which were essentially round-trip transactions that allowed tenants to meet their lease payment obligations in the short-term; (iii) the Company's tactics were used to avoid recording asset impairment charges and write-offs of rent receivables that were otherwise required; (iv) the Company intentionally delayed recording a $283 million impairment charge related to Prospect and the Pennsylvania Properties, which was belatedly recorded at the end of the Class Period; and (v) the Company failed to record needed impairment charges with respect to other tenants beyond Prospect and the Pennsylvania Properties. As a result, the Company's public disclosures throughout the Class Period about, *inter alia*, its net income, FFO, NFFO, Investment in Financing Leases, asset impairment policy, and tenants in general and Prospect and Pennsylvania Properties in particular, were materially false and misleading when made.

### C.   The Truth Emerges

#### 1.   The Viceroy Report

68.   During the Class Period, investors belatedly began to learn the truth about the Company's finances and operations. For example, on January 26, 2023, Viceroy Research published an extensive report (previously defined as the "Viceroy

Report") discussing the Company's use of improper business practices to strengthen its financial results.[6]

69.     The Viceroy Report noted that Defendants engaged in "billions of dollars of uncommercial transactions with its tenants . . . in . . . a pervasive revenue round-robin scheme." The Report identified four interrelated types of "uncommercial" transactions by which the Company "round-tripped" cash to its tenants to be used to make lease payments back to the Company. Defendants engaged in this scheme in order to conceal from investors the fact that "[s]ubstantially all of [Medical Properties'] major tenants appear distressed."

70.     The result of the round-trip transactions was that the Company's real estate assets, including the Prospect facilities and many others, were made to appear more solvent than they actually were, avoiding the need for impairment charges and write-offs of rent receivables. This led to the value of the real estate assets being "massively overstated" on the Company's balance sheet. It also caused the Company's net income, FFO, and NFFO to be inflated due to the avoidance of necessary impairment charges and write-offs of rent receivables.

71.     The   Viceroy   Report   identified   four   types   of   "uncommercial

---

[6] Plaintiff relies on only those portions of the Viceroy Report that are expressly set forth herein. Plaintiff relies on those portions as general support for Plaintiff's overarching allegations that Defendants failed to record necessary asset impairment charges and write-offs of rent receivables and concealed the distressed state of the Company's tenants. Plaintiff does not rely on any tweets issued by Viceroy or its employees.

transactions" summarized below.

72.   Sale-Leasebacks: The Company generally purchased properties on sale-leaseback terms such that the seller of the property became the tenant. In many instances, the counterparty to these transactions was distressed. As the Viceroy Report explained, Medical Properties "constantly overpay[s] for fire sale assets, . . . which in turn allows debt-crippled tenants to meet their financial rent obligations as and when they fall due in the short term." According to Viceroy, the Company engaged in billions of dollars of sale-leaseback transactions with distressed tenants to provide them with sufficient cash to prop up the struggling properties and allow them to make continuing rent payments. The Company's management was motivated to add such struggling properties to the Company's real estate portfolio because it increased the Company's "Acquisition" totals, which was an important metric impacting management's performance-based compensation. Indeed, performance-based compensation linked in part to acquisitions routinely exceeded executives' non performance-based compensation.

73.   Cash Giveaways: The Viceroy Report stated that Medical Properties "engages in various transactions with a common cast of friends in which hundreds of millions of dollars go missing. [The Company] has disappeared hundreds of millions of dollars in what appear to be fraudulent transactions." According to Viceroy, in these transactions "substantial portions of cash is round-tripped back" to Medical Properties

in the form of rent payments.

74.   <u>Bailouts</u>: Viceroy referred to the third type of transaction as a "bailout transaction." According to Viceroy, the Company spent hundreds of millions of dollars bailing out distressed tenants through a variety of means. For example, if an existing tenant was struggling, Medical Properties would sometimes purchase equity in the tenant (*i.e.*, purchase shares of the tenant's stock) or issue a loan to the tenant. This was a means of providing cash that would then be used to make lease payments back to the Company in another example of round-tripping.

75.   <u>Capital Expenditures and Maintenance Costs</u>: The Viceroy Report detailed a fourth practice whereby the Company coordinated with tenants to fabricate fake or exaggerated capital expenditure ("capex") projects as a means of transferring money to tenants through the guise of construction or maintenance costs. According to Viceroy:

- "Various of [Medical Properties'] ongoing [property] developments appear to be either non-existent or have not broken ground. Despite this, [Medical Properties] claims to have spent tens of millions of dollars on each development. Site visits of barren construction sites and local news sources suggest this is a lie."

- "[In one example,] news stories, including a site visit in October 2022, show that the development site does not appear to have broken ground, and does not even have a site office. . . . [Medical Properties] claimed to have outlaid $58m on this development . . . ."

- "[Medical Properties'] tenants are exclusively on triple-net leases, meaning they are on the hook for real estate taxes, insurance, and maintenance. Despite this, various filings and [Medical Properties']

financial accounts show substantial cash amounts being devoted to capex, including maintenance, of its distressed tenants."

In other words, in order to provide a purportedly valid reason to route cash to tenants, Defendants allegedly fabricated capital expenditure and maintenance projects that did not exist or were exaggerated in scope. The cash was not used for actual capital expenditures or maintenance, but instead was routed to distressed tenants to fund lease payments back to the Company in round-trip transactions. The Company's use of its own cash for capital expenditures and maintenance projects was unnecessary because, as disclosed in the Company's Form 10-Ks throughout the Class Period, "leases of our facilities are generally 'net' leases with terms requiring the tenant to pay all ongoing operating and maintenance expenses of the facility, including . . . the costs of capital expenditures, repairs, and maintenance."

76.   Viceroy's extensive research and investigation led it to the conclusion that Medical Properties' real estate assets were "massively overstated." The Viceroy Report included several "Key Takeaways" including the following:

- "[Medical Properties] has engaged in **billions of dollars of uncommercial transactions with its tenants . . . in order to mask a pervasive revenue round-robin scheme**."

- "***The value of [Medical Properties'] assets, as a result of capitalizing these uncommercial transactions, are massively overstated***."

- "***Many of [Medical Properties'] tenants are severely distressed***. This [creates] the need to engage in revenue round-robin transactions."

30

- "Financial accounting gimmicks ensure [Medical Properties'] management are incentivised [sic] to continue engaging in uncommercial transactions."

77.    The Viceroy Report noted that the Company's management team had a motive to engage in their financial wrongdoing. Specifically:

- "Substantially all executive performance-based incentives are tied to FFO, FFO Growth, EBITDA, and 'Acquisitions.'"

- "[Medical Properties'] 'growth strategy' and executive incentive schemes reward 'Acquisitions.' . . . [M]anagement has consistently scraped the bottom of the barrel in its search for new properties and new tenants. All these transactions will look good on paper. All these transactions will qualify executives for bonuses."

78.    In other words, management's performance-based compensation was tied to the Company's FFO, EBITDA (earnings before interest, taxes, depreciation, and amortization), and Acquisitions. Management's scheme allowed the Company to avoid recording impairment losses, which would have reduced the Company's EBITDA and FFO and directly led to lower executive compensation. Management also had a motive to engage in aggressive and unnecessary acquisitions with distressed tenants, and help them with uncommercial transactions, to increase management's compensation.

79.    Viceroy's conclusion about the Company using round-trip transactions to boost tenants' rent payments was consistent with previous reporting by *The Wall Street Journal*, which stated on February 14, 2022: "***Former MPT employees familiar with the company's transactions said they saw deals with Steward [which was***

*Medical Properties' largest tenant] as a way for MPT to provide it with cash as it notched losses, which in turn helped Steward make its rent payments and kept MPT growing*."[7]

80.    Similarly, *The Wall Street Journal* reported on Steward's weak financial condition and Medical Properties' over-payment for Steward assets, stating as follows on June 18, 2021:

> When Steward ran into financial trouble, Medical Properties Trust provided it more than $700 million through a series of complex deals . . . . [**For example, Medical Properties] provided $200 million to buy Steward assets valued at $27 million**. . . .
>
> Steward accounted for 30% of Medical Properties Trust's revenue last year. Steward lost more than $400 million in 2020 and reported nearly $1 billion of unpaid supplier expenses and other bills . . . . The company also faces audits by the Internal Revenue Service and state authorities. . . .
>
> [A]t the end of last year, [Steward's] short-term liabilities significantly exceeded its current assets.[8]

81.    An analyst firm aptly described *The Wall Street Journal's* coverage as "suggest[ing] **sketchy dealings** . . . , in part by detailing MPW's transactions

---

[7] *See* "How a Small Alabama Company Fueled Private Equity's Push Into Hospitals," *The Wall Street Journal* (Feb. 14, 2022), *available at* https://www.wsj.com/articles/hospitals-private-equity-reit-mpt-steward-11644849598?st=5ua0s388382864n&reflink=desktopwebshare_permalink.

[8] *See* "PE-Backed Hospital Chain Got Help From Major Landlord as Losses Mounted," *The Wall Street Journal* (June 18, 2021), *available at* https://www.wsj.com/articles/pe-backed-hospital-chain-got-help-from-major-landlord-as-losses-mounted-11624014000?st=ekjorecj826zk07&reflink=desktopwebshare_permalink.

supporting Steward while it [Steward] was . . . losing significant amounts of money."[9]

82.     On March 17, 2023, U.S. Senator Charles E. Grassley sent a letter to Medical Properties and several other entities addressing instances in which Medical Properties and private equity firms that own hospitals engage in sale-leaseback transactions that ultimately result in financial strain for the hospitals and lead to diminished patient care. Senator Grassley's letter noted: "Of particular concern is a 2019 transaction where MPT [Medical Properties Trust] . . . acquired the real estate of 10 LifePoint Hospitals for $700 million in what is known as a sale-leaseback transaction. A recent article characterized MPT's sale-leaseback deals as '. . . [P]onzi finance, a series of financial games to dump losses not just onto patients and communities, but onto investors/taxpayers.'"[10]

83.     The article that Senator Grassley quoted above was highly critical of Medical Properties and its sale-leaseback model. The article, which was dated January 4, 2023 (prior to the Viceroy Report and consistent with the concerns raised therein), stated:

> MPT [Medical Properties Trust] specializes in a specific arrangement that damages health care delivery. It's called a sale-leaseback. In a sale-leaseback, a private equity firm will buy a hospital, sell the land underneath it [to Medical Properties] for cash, and pay itself a dividend [with cash proceeds from the sale to Medical Properties], leaving the hospital saddled with high rent payments going forward. . . . A

---

[9] *See* Truist Securities analyst report dated March 23, 2022.

[10]     *See*     https://www.grassley.senate.gov/imo/media/doc/grassley_to_private_equity_reit_-_ottumwa_regional_health.pdf.

corporate landlord [Medical Properties] now has a stream of promised rent payments, a PE [private equity] fund gets a bunch of cash upfront, and a hospital, often financially weakened, owes a bunch of rent where before it didn't.

Still, someone has to provide the cash to buy the land, and that's what MPT does. . . . It specializes in smaller cities where struggling hospitals serve poor populations.

But how can such a model be profitable? The answer is that it probably isn't. . . . **MPT is likely burning through cash to show the appearance of growth. It buys land from private equity-owned hospitals, and then gets rent payments. But when those hospitals can't afford to pay the rent, MPT will effectively lend money to help those hospitals make their rent payments. That way, it doesn't look like there's a default [in rent payments]. . . . If such corporations can't pay rent, no problem. MPT can lend to keep the rent money flowing back to itself**.

. . . . MPT is [funding] rent to itself. The firm then uses this . . . financing to keep the rent payments to itself going. **What's the end point? It's . . . to let insiders [at Medical Properties] extract cash. As the Wall Street Journal detailed, MPT executives have compensation "linked to the volume of acquisitions completed by the company and other growth metrics."** Its CEO, Edward Aldag, earned $17 million in 2020, and sold $15 million of stock last year.[11]

84.     These additional sources are consistent with Viceroy's conclusion that Medical Properties uses unjustified round-trip transactions to boost tenants' rent payments to mask the need to record impairment charges.

### 2.     Medical Properties' Announcement of a $283 Million Impairment Charge Related to Prospect and the Pennsylvania Properties

85.     On February 23, 2023, Medical Properties filed a Form 8-K with the

---

[11] *See* https://www.thebignewsletter.com/p/ponzi-hospitals-and-counterfeit-capitalism.

SEC, which attached a press release containing the financial results for the quarter and year ended December 31, 2022. The results reflected a manifestation of the concerns raised by Viceroy and others that were skeptical of Medical Properties' round-trip transactions. The Company disclosed that it was recording a $283 million impairment charge consisting of a $171 million write-down of assets related to the Pennsylvania Properties and a $112 million write-off of unbilled rent owed by Prospect. Specifically, the Company stated:

> [F]ourth quarter 2022 net loss and full-year 2022 net income included a ***real estate impairment of approximately $171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania*** as well as a ***write-off of roughly $112 million in unbilled Prospect rent*** also included in Funds from Operations ("FFO") but excluded from normalized results.

86.    In a separate Form 8-K, also filed on February 23, 2023, Medical Properties disclosed that Emmett E. McLean, who was the Company's Co-Founder, Executive Vice President, and Chief Operating Officer, was stepping down effective September 1, 2023. McLean had been with the Company for more than twenty years.

87.    The disclosure of this corrective information cost investors dearly. Shares of Medical Properties common stock fell by 8.7%, or $1.06, from a closing price of $12.20 per share on February 22, 2023 to a close of $11.14 per share on February 23, 2023. As a result, Medical Properties suffered a market capitalization loss of $634 million. Company shares continued to lose their value in the next several trading days, and by March 1, 2023, the share price closed at $10.07 – a total decline

of 17.5%. All told, Medical Properties suffered a market capitalization loss of more than ***$1.25 billion***.

88.    On March 1, 2023, the Company filed its Form 10-K for the year ended December 31, 2022. The 10-K provided additional details about the impairment charge, stating in relevant part:

> Prospect (like other healthcare systems around the world) struggled through the COVID-19 pandemic, starting in early 2020 and continuing through much of the 2022 first quarter with the impact from the Omicron variant. Although admissions, surgeries, and ER visits are back above pre-COVID levels at their California and Connecticut properties, Prospect's four Pennsylvania facilities are still trailing. Now with the impact of higher labor and other costs due to inflation, Prospect has experienced a decline in cash flows during 2022. Prospect has been working through various restructuring plans to manage their cash flow. Some of these plans have made it to the binding commitment stage, including the expected sale of their Connecticut properties to Yale New Haven Health ("Yale") announced in October 2022, while others have not.

> Until the 2022 fourth quarter, Prospect was current on its rent and interest obligations under the various agreements. However, with ***rent and interest now past due*** and certain of Prospect's restructuring plans yet to be finalized, we recorded an approximate ***$280 million impairment charge in the 2022 fourth quarter***, as shown in "Real estate and other impairment charges, net" on the consolidated statements of net income. As part of this charge, ***we reduced the carrying value of the underperforming Pennsylvania properties by approximately $170 million (to approximately $250 million) and reserved all non-cash rent [due from Prospect] for a total of $112 million. We expect to record rent on our Prospect leases on a cash basis for the foreseeable future***.

89.    The $283 million impairment charge was material to the Company's operations. The $283 million figure was equivalent to 31% of the Company's $904

million net income for the year ended December 31, 2022.

90.    The Viceroy Report and the Company's announcement of the $283 million impairment charge each represented a partial disclosure of previously concealed facts about weaknesses in the Company's operations. Collectively, they revealed that, among other things, many of the Company's tenants were distressed, the Company was resorting to misleading tactics to ensure the continuing receipt of rent payments to avoid impairment charges, and that massive write-downs were in fact needed.

### D.    Defendants' Misconduct

#### 1.    Defendants Knew of Financial Problems at Prospect and the Pennsylvania Properties Long Before Recording the Q4 2022 Impairment Charge

91.    Defendants knew of significant financial problems at Prospect and the Pennsylvania Properties long before 2022. That knowledge should have prompted the Company to record an impairment charge much sooner than Q4 2022.

92.    For example, the 2022 Form 10-K noted that "Prospect . . . struggled through the COVID-19 pandemic, *starting in early 2020* and continuing through much of the 2022 first quarter." The 10-K also noted that operations at the Pennsylvania Properties languished from 2020 to the present: "Although admissions, surgeries, and ER visits are back above pre-COVID levels at their California and Connecticut properties, Prospect's four Pennsylvania facilities are still trailing."

These are not new facts that arose in Q4 2022, but rather facts that Defendants knew from early 2020 forward yet intentionally ignored when conducting their impairment analysis.

93.     Information from various other sources reveals clear weaknesses in Prospect's financial position and liquidity, both before and after Medical Properties purchased Prospect's facilities in the August 2019 sale-leaseback transaction.

94.     For example, according to the Viceroy Report, Prospect's declining financial condition in 2019 "prompted Moody's to downgrade [Prospect's] credit rating to *junk status* in March 2019 citing *poor liquidity outlook* and leverage levels."

95.     On July 31, 2020, the Private Equity Stakeholder Project, a nonprofit group, stated that the sale-leaseback transaction between Medical Properties and Prospect left Prospect in a worse financial position than it was in prior to the transaction, and that Prospect's ability to pay rent to Medical Properties is tenuous:

> *[T]he sale-leaseback of almost all of Prospect's real estate [to Medical Properties] left [Prospect]  in a worse financial position than before the transaction*.
>
>         . . . .
>
> In 2019, in an effort to pay down some of the existing $1.1 billion debt it had accrued . . . , Prospect sold much of its hospitals' real estate to . . . Medical Properties Trust and leased it back. Prospect . . . characterized the sale-leaseback transaction as beneficial to the hospital company, though this is misleading; the sale-leaseback merely replaced debt with lease liabilities and left Prospect with fewer assets.
>
>         . . . .

> ***Prospect pays Medical Properties Trust around $116 million per year in rent. Even before COVID-19, it was not clear how Prospect would be able to pay the rent it owes Medical Properties Trust* . . . .[12]**

96.     On September 30, 2020, ProPublica published an article pointing out significant weaknesses in Prospect's financial condition, including liquidity shortfalls at the Pennsylvania Properties:

> Paramedics for Prospect's hospital near Philadelphia told ProPublica that they've repeatedly gone to fuel up their ambulances only to come away empty at the pump: Their hospital-supplied gas cards were rejected because ***Prospect hadn't paid its bill***. A similar penury afflicts medical supplies. "Say we need 4x4 sponges, dressing for a patient, IV fluids," said Leslie Heygood, a veteran registered nurse at one of Prospect's Pennsylvania hospitals, "we might not have it on the shelf because it's on 'credit hold' because ***they haven't paid their creditors***."
>
> . . . .
>
> As elsewhere, Prospect's ***failure to pay bills on time*** has delayed repairs and resulted in supply shortages. At Delaware County Hospital [in Pennsylvania], veteran nurse Angela Neopolitano said . . . ***"Creditors would not come in to fix things because the hospital owed them money"*** . . . .[13]

97.     On February 4, 2021, ProPublica published a follow-up article discussing a lawsuit involving Prospect's unfunded pension obligations. ProPublica stated: "A financial consultant for the receiver [representing beneficiaries of the

---

[12] *See* https://pestakeholder.org/news/broken-promises-rhode-island-regulators-question-leonard-greens-investment-in-prospect-medical-holdings-2/.

[13] *See* https://www.propublica.org/article/investors-extracted-400-million-from-a-hospital-chain-that-sometimes-couldnt-pay-for-medical-supplies-or-gas-for-ambulances.

pension fund] warned in a report that Prospect's financial statements through fiscal year 2019 (even preceding the financial stress caused by the COVID-19 pandemic) revealed a ***worsening 'state of insolvency' and 'imminent' bankruptcy* . . . ."**[14]**

98.     On June 1, 2021, the Rhode Island Attorney General issued a "Decision" in a hospital change-of-ownership proceeding noting serious financial shortfalls at Prospect. The Decision stated in relevant part:

> ***Our investigation revealed a company [Prospect] whose . . . liabilities now exceed assets by over $1 billion [as of September 30, 2020]*** . . . . [T]his debt-to-asset ratio raises a concern for the Attorney General that the national company . . . can become ***unstable***, disrupting and even threatening Rhode Island's third largest hospital system. In other words, PMH [Prospect Medical Holdings] is a system that is at risk of developing a ***lack of financial ability to respond to the volatility of the healthcare market***, putting every hospital in its system . . . at risk of reduction in services, sale, or closure.
>
>          . . . .
>
> ***PMH . . . has and continues to struggle financially***. *See, e.g.,* PYA Report 19 (explaining that "PMH has reported ***limited liquidity*** and a highly leveraged position in recent fiscal years"); . . . . During the 6-year period from . . . 2015 to . . . 2020, the company took a cumulative comprehensive loss of $603 million, and has seen its long-term debt increase from $451 million in . . . 2015 to almost $1.6 billion in . . . 2020.
>
>          . . . .
>
> What is more, the company's ***ballooning debt has not always translated into enough liquidity to pay its bills***. . . . PMH is a highly leveraged company that ***continues to have large annual losses***.

---

[14] *See* https://www.propublica.org/article/rich-investors-stripped-millions-from-a-hospital-chain-and-want-to-leave-it-behind-a-tiny-state-stands-in-their-way.

. . . .

***PMH's ability to meet its medium- and long-term debt obligations are becoming more uncertain with each passing year***.

. . . .

Another metric used to gauge a company's financial health is the quick ratio. This ratio measures a company's liquidity, that is, its ability to cover short-term financial obligations such as payroll, vendor invoices, and outstanding or impending interest payments. . . . In essence, the lower the value of this ratio, the more likely it is that a company will be unable to pay its bills. . . . The following chart ("Table 2") plots PMH's quick ratios from . . . 2015 through . . . 2020, which are based on PMH's audited financial statements and calculated by the Attorney General's financial expert. . . . As Table 2 shows, PMH's quick ratio was under 1.0 at the end of every Fiscal Year from 2015 to 2020, meaning that ***the company had less than $1 to cover every $1 in short-term financial obligations***. . . . The Attorney General sees this as creating a circumstance where ***PMH will not be able to find operational cash when it is needed***. *See* Carris Report 9 ("***PMH has sold substantially all its real property [to Medical Properties] . . . . There is very little left to leverage to provide liquidity***."). . . . PMH's ratio lagged the median ratio of publicly traded hospital companies, which remained over 1.0 from . . . 2015 to . . . 2019. This indicates that PMH was at a relatively higher risk of running out of cash or other liquid assets to meet its short-term financial obligations than its publicly traded counterparts.[15]

99.    The Rhode Island Attorney General further observed that Prospect's lease and loan payments owed to Medical Properties added to Prospect's financial strain:

---

[15] *See* State of Rhode Island, Office of Attorney General, Decision (June 1, 2021), pg. 2, 30-31, 44-48,                                              *available                                              at* https://riag.ri.gov/sites/g/files/xkgbur496/files/documents/Prospect_Chamber_Ivy_AG_HCA_Decision.pdf.

> *A considerable portion of the . . . $3.1 billion in liabilities currently on PMH's books is the result of three transactions PMH entered into with Medical Properties Trust, Inc. ("MPT") in 2019*. . . . In the first of these, PMH sold its hospitals in Connecticut, Pennsylvania, and all but one of its hospitals in California to MPT for approximately $1.4 billion. MPT then leased these hospitals back to PMH. PMH, according to its agreement with MPT, will pay rent for at least the next 15 years in order to continue operating . . . . In the second transaction, PMH took out a ~$51 million mortgage on one of its California hospitals; this mortgage is at a 7.5% interest rate per annum . . . . And in the third transaction, PMH signed a promissory note in exchange for $113 million from MPT, referred to herein as the "TRS Note." Interest on the note is 7.5% per annum and subject to an annual escalation clause. . . . The Attorney General has addressed this threat to the Rhode Island Hospitals' real estate by prohibiting it from being pledged or used as collateral unless approved by the Attorney General.[16]

100.    The Rhode Island Attorney General's expert witness even concluded that

Prospect will likely face a liquidity crisis within the next 18 to 24 months:

> While I do not believe that PMH faces a *liquidity crisis* in the next twelve months, *I believe it will come sooner rather than later, probably within 18 to 24 months.* They cannot continue to have significant operating losses and fund necessary capital projects and expect to survive long-term.[17]

101.    Certain versions of Prospect's financial statements were attached to the

Rhode Island Attorney General's June 1, 2021 Decision. The financial statements

indicated that Prospect incurred net losses of $100 million in 2020, $298 million in

2019, and $244 million in 2018.[18] The financial statements also indicated that

Prospect's overall revenue ("net revenue") declined in each successive year from 2018

---

[16] *Id*. at 32.

[17] *Id*. at 101.

[18] *Id*. at pg. 111; *accord* pg. 130.

to 2020.[19]

102.   The Rhode Island Attorney General also relied on a second financial advisory firm, "PYA," which analyzed Prospect's financial condition. PYA identified major weaknesses in Prospect's financial stability through year-end 2020, stating:

- Prospect is ***"[n]ot generating cash sufficient to fund operations"***;

- "PMH's leveraged position has increased to a point where, ***at September 30, 2020, PMH's total liabilities exceeded total assets by . . . $1.06 billion***";

- Prospect has "[a]ccumulated net operating losses FY2015 – FY2020 [of] $88.1 million"; and

- "PMH face[s] ***long-term financial viability risks***."[20]

103.   These collective conclusions by the Rhode Island Attorney General became public on June 1, 2021, in the middle of the Class Period, nearly two years before Defendants belatedly recorded the $283 million impairment charge regarding Prospect. The conclusions were based on Prospect's financial statements from 2020 and earlier, which were available to Defendants during their due diligence and ongoing monitoring of Prospect's financial condition. Indeed, as discussed *infra*, Medical Properties disclosed that it closely monitors its tenants' financial positions on an ongoing basis. Thus, Defendants had access to Prospect's financial statements,

---

[19] *Id.*

[20]    *See*   https://pestakeholder.org/wp-content/uploads/2021/04/2021.04.06_PYA_RIDOH_presentation.pdf at pg. 11, 16, 20.

analyzed those financial statements, and turned a blind eye to the significant red flags indicating liquidity problems and doubt about Prospect's ability to make future lease payments. That information should have prompted Medical Properties to record an impairment charge much sooner than Q4 2022.

104.    Subsequently, on March 9, 2022, the Private Equity Stakeholder Project noted additional financial difficulties at all four of the Pennsylvania Properties, stating: "Crozer[] . . . 'laid off about 100 employees earlier this month, including the executive suite . . . . Last month, Prospect closed the maternity ward at Delaware County Memorial and suspended all inpatient services at Springfield. It is closing the 10-bed hospice unit at Taylor Hospital Friday.'"[21]

105.    On September 19, 2022, Credit Suisse issued an analyst report noting that Prospect had a "**weak liquidity profile**," and further stating:

> Prospect, MPW's third largest tenant . . . , reported a . . . rent coverage [ratio] of 0.6x in 2Q22 . . . . Though a smaller tenant than Steward, this presents a much larger concern in our opinion given the **dire financial situation [at Prospect]**, string of executive layoffs, staff shortages and recent legal action by Delaware County in Pennsylvania to force Prospect to keep essential parts of its hospitals running. . . . [There are] **poor financial condition[s] and operating challenges at quite a few of the Prospect operated hospitals that are owned by MPW**. . . . We note that Prospect was actively seeking to sell its operations in Delaware County, Pennsylvania and in the State of Connecticut but the Delaware County, Pennsylvania transaction with ChristianaCare has fallen apart which again **raises concern about potential sources of cash for Prospect to meet its obligations**.

---

[21]    *See*    https://pestakeholder.org/news/prospect-medical-holdings-continues-to-sell-off-its-hospitals-leaving-patient-care-in-question/.

106.   On October 27, 2022, during an earnings call with analysts four months before belatedly announcing the $283 million impairment charge, Defendant Aldag acknowledged weaknesses in the collectability of rent for the Pennsylvania Properties:

[Question:] What's your confidence around that rent [from Prospect] being current going forward?

[Answer:] . . . *The Pennsylvania facilities are not where we would like them to be, certainly disappointed in where they are*.

107.   On November 4, 2022, RBC Capital Markets issued an analyst report stating: "[The] Prospect situation [is] more uncertain . . . . This operator has struggled particularly in its Connecticut and Pennsylvania portfolios . . . . *The Pennsylvania portfolio . . . has been cash flow negative (even before rent)*. . . . The PA portfolio in particular seems at risk."

108.   Throughout 2022 (and likely sooner), Medical Properties used a ratio called "EBITDARM Rent Coverage" to measure its tenants' ability to make rent payments. The EBITDARM Rent Coverage ratio reflects the ratio of a tenant's available earnings to its rent obligations. Medical Properties defined EBITDARM (the numerator of the ratio) as "facility-level earnings before interest, taxes, depreciation, amortization, rent, and management fees."[22] The denominator of the ratio was the

---

[22] *See* Medical Properties Trust "Q4 2022 Supplemental Information" packet at pg. 13, *available at* https://medicalpropertiestrust.gcs-web.com/static-files/05032118-620e-4f31-be6b-25ec995469c9.

tenant's annual rent obligation. The higher the ratio, the more earnings are available to pay rent, and vice versa. Prospect's EBITDARM ratio was the lowest (*i.e.*, weakest) or near-lowest among all Medical Properties tenants from when the Company first began publicly reporting EBITDARM ratios in Q1 2022 until the end of the Class Period.[23] Prospect's EBITDARM ratio ranged from negative -0.5x to positive 1.9x throughout that period, meaning its earnings (even *before* subtracting expenses for interest, taxes, depreciation, amortization, rent, and management fees) were less than or only marginally greater than its rent obligations. This is another indication of Defendants' awareness of Prospect's inability to pay its rent.

109.   In sum, throughout the Class Period, Defendants were well aware of significant financial difficulties at Prospect and the Pennsylvania Properties. Despite that knowledge, Defendants failed to timely record an impairment charge.

110.   The collective facts from the sources cited above raise two separate issues.

---

[23] *See* Medical Properties Trust "Q1 2022 Supplemental Information" packet at pg. 13, *available at* https://medicalpropertiestrust.gcs-web.com/static-files/0a544257-1445-4355-99ce-3375c5dc1fdc (Prospect's 1.9x EBITDARM ratio was third-lowest among fifteen reported tenants); "Q2 2022 Supplemental Information" packet at pg. 14, *available at* https://medicalpropertiestrust.gcs-web.com/static-files/c8b9aa88-725f-49f6-8640-5f6265c4bb32 (Prospect's 1.3x EBITDARM ratio was lowest among fifteen reported tenants); "Q3 2022 Supplemental Information" packet at pg. 14, *available at* https://medicalpropertiestrust.gcs-web.com/static-files/bcb51f25-1a3f-4b32-8ff5-fee771b1ddb0 (Prospect's -0.2x EBITDARM ratio was lowest, by far, among thirteen reported tenants); "Q4 2022 Supplemental Information" packet at pg. 14, *available at* https://medicalpropertiestrust.gcs-web.com/static-files/05032118-620e-4f31-be6b-25ec995469c9 (Prospect's -0.5x EBITDARM ratio was lowest, by far, among twelve reported tenants).

111.   First, the belated impairment charge specific to the Pennsylvania Properties should have been recorded much sooner than Q4 2022. Defendants were aware of financial problems at the Pennsylvania Properties throughout the entire Class Period. Defendants were also aware that Prospect's overall financial position was perilous, meaning Prospect had a limited ability to backstop the Pennsylvania Properties. Defendants had a duty under Generally Accepted Accounting Procedures ("GAAP") to record the impairment charge when it became probable that rent payments were in jeopardy, not later when rent payments actually stopped being made.

112.   Second, Defendants should have recorded impairment charges related to Prospect properties beyond just the Pennsylvania Properties. The Company's Prospect portfolio consisted of fourteen properties, yet Defendants recorded an impairment charge for just the four Pennsylvania Properties. Prospect's financial difficulties extended well beyond the Pennsylvania Properties. Given the length and breadth of Prospect's financial difficulties, Defendants should have recorded impairment charges encompassing some or all of Prospect's other properties beyond just the Pennsylvania Properties.

113.   Indeed, on an earnings call with analysts on February 23, 2023, Defendants Aldag and Hamner acknowledged that Prospect had not been paying rent for its California facilities:

[Question:] [D]o you -- so [am] I right to interpret that there's going to be a shortfall in the California rent collection as well?

[Answer from Def. Aldag:] That's quite possible, yes.

[Question:] OK. Are they [Prospect] paying rent currently [for] the California . . . hospitals?

[Answer from Def. Hamner:] No. For -- as I mentioned a little earlier, very little of January, February [2023] rent has been paid.[24]

114.   The revelation that Prospect was not paying rent for the California facilities in January and February 2023 (which was during the Class Period) meant that the vast majority of Prospect's facilities stopped paying rent during the Class Period. Despite foreseeing that Prospect would be unable to pay rent, Defendants failed to record an impairment charge for any Prospect properties beyond the Pennsylvania Properties.

115.   Defendants should have kept a particularly close watch on Prospect's financial condition given how important Prospect was to Medical Properties' overall business. Prospect was one of only three tenants to contribute more than 10% of Medical Properties' revenue in 2020, 2021, and 2022.[25] Similarly, Prospect was the Company's third-largest tenant every year from 2019 to 2022 measured by gross

---

[24] *See* https://www.fool.com/earnings/call-transcripts/2023/02/23/medical-properties-trust-mpw-q4-2022-earnings-call/.

[25] *See* Form 10-K for the year ended December 31, 2020 at pg. 84; Form 10-K for the year ended December 31, 2021 at pg. 80; Form 10-K for the year ended December 31, 2022 at pg. 85.

assets under lease.[26] In short, Prospect was a major tenant whose financial results could foreseeably and did have a significant impact on the financial condition of Medical Properties. Given the importance of Prospect to Medical Properties' overall financial results, Defendants had a heightened duty to keep a close watch on Prospect's financial status and ability to pay rent.

116.   Similarly, the Pennsylvania Properties represented 26% of the asset value of the overall Prospect portfolio,[27] and 20% to 25% of the revenue of the overall Prospect portfolio.[28] Given the importance of the Pennsylvania Properties to the Prospect portfolio, Defendants had a duty to keep a close watch on the Pennsylvania Properties throughout the Class Period.

117.   In fact, Medical Properties disclosed that it closely monitors its tenants' financial condition at both the tenant-level and facility-level to ensure an ongoing ability to pay rent:

---

[26] *See* Form 10-K for the year ended December 31, 2019 at pg. 12 (chart indicating Prospect was third-largest tenant in 2019 behind Steward and Circle); Form 10-K for the year ended December 31, 2020 at pg. 12 (same); Form 10-K for the year ended December 31, 2021 at pg. 12 (same); Form 10-K for the year ended December 31, 2022 at pg. 13 (same).

[27] The asset value of the overall Prospect portfolio was $1.6 billion prior to the $283 million write down. *See* Form 10-K for the year ended December 31, 2021 at pg. 12. The asset value of the Pennsylvania Properties was $420 million prior to the write down. *See* Form 10-K for the year ended December 31, 2022 at pg. 83 (impairment charge "reduced the carrying value of the . . . Pennsylvania properties by approximately $170 million ([from $420 million] to . . . $250 million)"). Thus, the Pennsylvania Properties represented 26% of the value of the overall Prospect portfolio.

[28] *See* Credit Suisse analyst report dated December 21, 2022 ("Per management, Pennsylvania represents 20% - 25% of Prospect's revenues to MPW.").

The capacity of our tenants to pay our rents and interest is dependent upon their ability to conduct their operations at profitable levels. . . . Accordingly, *we monitor certain key performance indicators that we believe provide us with early indications of conditions that could affect the level of risk in our portfolio*.

Key factors that we may consider in . . . our ongoing monitoring of our tenants' . . . performance, as well as the condition of our properties, include, but are not limited to, the following:

> . . . .

> - *facility operating performance measured by current, historical, and prospective operating margins (measured by a tenant's earnings before interest, taxes, depreciation, amortization, management fees, and facility rent) of each tenant and at each facility*;

> . . . .

> - trends in tenants' cash collections, including comparison to recorded net patient service revenues;

> - *tenants' free cash flow*; [and]

> - *the potential impact of healthcare pandemics/epidemics . . . on our tenants' profitability and liquidity*.[29]

118.   Medical Properties provided additional details about its review of tenants' financial results, stating:

> Losses from Rent Receivables: *For all leases, we continuously monitor the [financial] performance of our existing tenants* including, but not limited to: admission levels and surgery/procedure volumes by type; current operating margins; ratio of our tenants' operating margins both to facility rent and to facility rent plus other fixed costs; trends in

---

[29] *See* Form 10-K for the year ended December 31, 2021 at pg. 8-9. Substantially similar disclosures were included in the other 10-Ks filed throughout the Class Period.

revenue, cash collections, patient mix; and the effect of . . . other events ongoing (such as the health crisis caused by the COVID-19 outbreak) on tenants' profitability and liquidity.

<u>Losses from Operating Lease Receivables:</u> We utilize the information above along with the tenants' payment and default history in evaluating (on a property-by-property basis) whether or not a provision for losses on outstanding billed rent and/or straight-line rent receivables is needed. A provision for losses on rent receivables (including straight-line rent receivables) is ultimately recorded when it becomes probable that the receivable will not be collected in full.[30]

119.   Accordingly, Defendants had a review process in place to know that Prospect and the Pennsylvania Properties were in a precarious financial condition throughout the Class Period. Defendants' review should have revealed the need for impairment charges within the overall Prospect portfolio and the Pennsylvania Properties.

120.   The $171 million impairment charge specific to the Pennsylvania Properties represented a 41% reduction to the $420 million carrying value of the Pennsylvania Properties. Defendants cannot credibly assert that a write down of that high a percent arose quickly and unexpectedly. The financial condition of the Pennsylvania Properties had been deteriorating for several years, as Defendants were well aware. Defendants intentionally and unlawfully delayed recording the impairment charge as long as they could, until Q4 2022.

---

[30] *See* Form 10-K for the year ended December 31, 2021 at pg. 41.

    **2.       GAAP Governing Impaired Lease Assets Required Defendants to Analyze the Information They Ignored Regarding Prospect's Financial Condition**

121.    Generally Accepted Accounting Principles required Medical Properties to analyze its tenants' financial condition on an ongoing basis to determine whether any asset impairment charges should be recorded.

122.    Medical Properties recorded the value of its Prospect leases on a balance sheet line item titled "Investment in Financing Leases."[31] That line item consisted of the aggregate future "lease payments receivable" to be paid by Prospect over the life of the leases (net of certain adjustments), plus the value ("residual value") of the real estate leased to Prospect.[32]

123.    Under GAAP, Defendants were required to periodically review the asset valuation for possible impairment. Specifically, GAAP governing Financing Leases states: "After the commencement date [of the lease], a lessor shall recognize all of the following: . . . c. Impairment of the net investment in the lease (as described in paragraph 842-30-35-3)."[33] In turn, paragraph 842-30-35-3 states: "A lessor shall determine impairment related to the net investment in the lease and shall recognize

---

[31] *See* Form 10-K for the year ended December 31, 2021 at pg. 75 ("We are accounting for these [Prospect] properties as a financing (as presented in the 'Investment in financing leases' line of the consolidated balance sheets) under lease accounting rules . . . ."); *accord* Form 10-K for the year ended December 31, 2022 at pg. 82.

[32] *See* Form 10-K for the year ended December 31, 2019 at pg. 85 (chart of components of Investment in Financing Leases line item); Form 10-K for the year ended December 31, 2021 at pg. 79 (same); Form 10-K for the year ended December 31, 2022 at pg. 82 (same).

[33] *See* Accounting Standards Codification ("ASC") para. 842-30-25-9.

any impairment in accordance with Topic 310 on receivables (as described in paragraphs 310-10-35-16 through 35-30)." In turn, Topic 310 states:

- "*A [receivable] is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the . . . agreement*." ASC 310-10-35-16.

- "Probable [means] the future event or events are likely to occur." ASC 310-10-35-18.

- "The term probable is . . . not intended to be so rigid that [it] require[s] virtual certainty before a loss is accrued. . . . [P]robable does not mean virtually certain." ASC 310-10-35-19.

- "When a [receivable] is impaired . . . , a creditor shall measure impairment based on the present value of *expected future cash flows* . . . ." ASC 310-10-35-22.

- "[T]he estimates of expected future cash flows shall be the creditor's best estimate based on reasonable and supportable assumptions and projections. *All available evidence . . . shall be considered in developing the estimate of expected future cash flows*. The weight given to the evidence shall be commensurate with the extent to which the evidence can be verified objectively." ASC 310-10-35-26.

- "*[A] creditor shall consider all available information reflecting past events and current conditions when developing the estimate of expected future cash flows. All available information would include existing . . . factors, for example, . . . economic . . . factors that are relevant to the collectibility of that [receivable]* and that indicate that it is probable that an asset had been impaired at the date of the financial statements." ASC 310-10-35-27.

124.   These GAAP rules established a duty for Defendants to closely analyze Prospect's financial condition to assess the likelihood that Prospect would pay the

amounts due under the leases. In making that determination, Defendants had a duty to analyze "all available evidence," including financial information provided by Prospect, external evidence such as the Rhode Island Attorney General conclusions and media reports discussed above, and any other reasonably available information bearing on Prospect's ability to make future rent payments.

125.   Defendants had access to information throughout the Class Period indicating that Prospect faced serious financial difficulties. That information indicated it was probable that Prospect would be unable to make material amounts of its future lease payments, thus necessitating an impairment charge.

126.   Defendants turned a blind eye to the abundant information available to them throughout the Class Period. Instead, they waited until Prospect *actually missed* rent payments before recording an impairment charge. *See* Form 10-K for the year ended December 31, 2022 at 83 ("Until the 2022 fourth quarter, Prospect was current on its rent and interest obligations under the various agreements. However, with rent and interest now past due . . . , we recorded an approximate $280 million impairment charge in the 2022 fourth quarter."). Defendants looked only to Prospect's actual rent default when deciding to record an impairment charge. Under GAAP, Defendants had a duty to look to other factors in advance of an actual default, including Prospect's weakening financial condition and Medical Properties' need to prop Prospect up to allow it to make certain lease payments. Defendants ignored those factors, and thereby

failed to properly assess lease payment receivables for impairment in violation of GAAP.

127.   Defendants' delay in recording the material impairment charge was reckless in light of the significant evidence of Prospect's financial strain throughout the Class Period.

128.   In light of these GAAP requirements, Defendants also had an obligation to evaluate the financial strength of other tenants beyond Prospect. As noted in the Viceroy Report, Defendants were well aware that many of the Company's other tenants were severely distressed and could not make future rent payments. Given that knowledge and the accompanying need for additional impairment charges, the Viceroy Report stated: "Viceroy believes [Medical Properties'] net investment in real estate is overvalued by at least 25% ($3.6b)." In sum, Defendants should have recorded additional impairment charges beyond just those related to Prospect.

> **3.   Defendants Violated Regulation S-K Item 303 by Failing to Disclose Known Trends and Uncertainties Regarding Anticipated Lease Payment Shortfalls**

129.   Medical Properties' Form 10-Ks are subject to the disclosure requirements of Item 303 of Regulation S-K, codified at 17 C.F.R. § 229.303. Item 303 governs the MD&A section of a company's Form 10-K.

130.   Among other things, Item 303 requires companies to disclose any "events or uncertainties" that are expected to have a material impact on the company's

"liquidity," "capital resources," and/or "results of operations." 17 C.F.R. § 229.303(b)(1)-(2).

131.   With respect to liquidity, Item 303 requires companies to "[i]dentify any known trends or . . . events or uncertainties that . . . are reasonably likely to result in the registrant's liquidity . . . decreasing in any material way." 17 C.F.R. § 229.303(b)(1)(i).

132.   With respect to capital resources, Item 303 requires companies to "[d]escribe any known material trends, favorable or unfavorable, in the registrant's capital resources." 17 C.F.R. § 229.303(b)(1)(ii)(B).

133.   With respect to results of operations, Item 303 requires companies to "[d]escribe any known trends or uncertainties that . . . are reasonably likely to have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).

134.   Under Item 303, Defendants should have disclosed in its MD&A during the Class Period the then-known fact that future lease payments from many of its tenants, including but not limited to Prospect, were in jeopardy due to the tenants' financial distress. Disclosure was necessary because a failure by tenants to make lease payments would have a material impact on the Company's liquidity, capital resources, and income from continuing operations.

135.   Under Item 303, disclosure is required if the adverse impact on liquidity,

capital resources, or income from continuing operations is merely "likely" to occur. The adverse impact need not be a certainty. Thus, even if Defendants did not know for certain that lease payments would be missed, they still had a duty to disclose the then-known fact that a given tenant's deteriorating financial condition was likely to affect the Company's liquidity, capital resources, or income from continuing operations.

136. Throughout the Class Period, the negative state of tenants' financial condition was a material trend and uncertainty that was reasonably likely to, and ultimately did, have a material impact on the Company's liquidity, capital resources, and income from continuing operations.

137. For example, the known trend and uncertainty regarding Prospect's financial distress eventually manifested when Prospect failed to make lease payments for the Pennsylvania Properties, prompting Defendants to record a $283 million impairment charge in Q4 2022. It is unreasonable to believe that, throughout the Class Period, Defendants had no knowledge of growing weaknesses in Prospect's financial condition and declining inability to make lease payments.

138. During the Class Period, Defendants should have disclosed the then-known trends and uncertainties regarding the collectability of Prospect's lease payments. Instead, Defendants remained silent until Q4 2022, when the $280 million impairment charge led to the precise outcome Item 303 was designed to protect

against: a surprise adverse impact on the Company's liquidity, capital resources, and income from continuing operations that Class members had no means to foresee.

139.    Item 303 specifies that for the "liquidity and capital resources disclosure, discussion of material cash requirements from known contractual obligations may include, for example, ***lease obligations***." This illustrates that Item 303 encompasses trends and uncertainties specifically related to lease payments.

140.    Defendants' failure to include the necessary Item 303 disclosures was a material and actionable omission in each of its Form 10-Ks throughout the Class Period.

141.    Separately, disclosure of tenants' distressed financial condition was also required under SEC rules adopted pursuant to the Securities Exchange Act of 1934. Specifically, a catch-all provision in disclosure rules regarding Forms 10-K and 10-Q states: "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading." 17 C.F.R. § 240.12b-20. The Company's SEC filings during the Class Period affirmatively represented that: (i) the Company received lease payments from tenants including Prospect; (ii) the Company periodically performed an impairment analysis of its assets; and (iii) "[w]e do not believe that the value of any of our facilities was impaired at [year end]." To prevent

those affirmative representations from being misleading, the Company had a duty to disclose the then-known material fact that many of its tenants, including but not limited to Prospect, were in a precarious financial condition and that lease payments from those tenants were in jeopardy.

### 4. The Individual Defendants Had a Motive to Misstate the Company's Financial Statements to Maximize Their Bonuses, Stock Awards, and Value of Their Aggregate Stock Holdings

142.   Defendants Aldag and Hamner received large amounts of performance-based compensation throughout the Class Period. Their performance-based compensation far exceeded their non performance-based compensation each year.[34]

143.   The performance-based compensation consisted of cash bonuses and stock awards.

144. The following chart summarizes all compensation received by Defendants Aldag and Hamner during the Class Period:

---

[34] Compensation data for Defendant Hanna is not publicly available. However, on information and belief (discussed *infra*), he too received large amounts of performance-based compensation throughout the Class Period, and his performance-based compensation exceeded his non performance-based compensation each year.

| Fiscal Year | Compensation Type | Defendant Aldag | Defendant Hamner |
|---|---|---|---|
| 2019[35] | Performance-Based | | |
| | Cash bonus | $2,250,000 | $1,050,000 |
| | Stock award | $8,738,092 | $4,369,047 |
| | **Total Performance-Based** | **$10,988,092** | **$5,419,047** |
| | Non Performance-Based | | |
| | Base salary | $1,000,000 | $600,000 |
| | Stock award | $5,166,717 | $2,583,358 |
| | Other (401k, life insurance, etc.) | $98,627 | $61,247 |
| | Total Non Performance-Based | $6,265,344 | $3,244,605 |
| | **Grand Total Compensation** | **$17,253,436** | **$8,663,652** |
| | | | |
| 2020[36] | Performance-Based | | |
| | Cash bonus | $3,000,000 | $1,518,750 |
| | Stock award | $8,577,179 | $4,288,590 |
| | **Total Performance-Based** | **$11,577,179** | **$5,807,340** |
| | Non Performance-Based | | |
| | Base salary | $1,000,000 | $675,000 |
| | Stock award | $4,154,854 | $2,077,439 |
| | Other (401k, life insurance, etc.) | $125,604 | $61,643 |
| | Total Non Performance-Based | $5,280,458 | $2,814,082 |
| | **Grand Total Compensation** | **$16,857,637** | **$8,621,422** |
| | | | |
| 2021[37] | Performance-Based | | |
| | Cash bonus | $3,000,000 | $1,518,750 |
| | Stock award | $8,654,604 | $4,327,302 |
| | **Total Performance-Based** | **$11,654,604** | **$5,846,052** |
| | Non Performance-Based | | |
| | Base salary | $1,000,000 | $675,000 |
| | Stock award | $4,273,928 | $2,136,964 |
| | Other (401k, life insurance, etc.) | $108,097 | $27,313 |
| | Total Non Performance-Based | $5,382,025 | $2,839,277 |
| | **Grand Total Compensation** | **$17,036,629** | **$8,685,329** |
| | | | |

---

[35] *See* Proxy Statement dated April 23, 2020 at pg. 33 and n.3.

[36] *See* Proxy Statement dated April 26, 2021 at pg. 40 and n.3.

[37] *See* Proxy Statement dated April 28, 2022 at pg. 44 and n.2.

| Fiscal Year | Compensation Type | Defendant Aldag | Defendant Hamner |
|---|---|---|---|
| 2022[38] | Performance-Based | | |
| | Cash bonus | $2,500,000 | $1,265,625 |
| | Stock award | $8,270,489 | $4,135,256 |
| | **Total Performance-Based** | **$10,770,489** | **$5,400,881** |
| | Non Performance-Based | | |
| | Base salary | $1,000,000 | $675,000 |
| | Stock award | $4,109,811 | $2,054,916 |
| | Other (401k, life insurance, etc.) | $145,213 | $32,974 |
| | Total Non Performance-Based | $5,255,024 | $2,762,890 |
| | **Grand Total Compensation** | **$16,025,513** | **$8,163,771** |

145.   Under the Company's performance-based compensation plan, the "cash bonus" was based largely on the results of the Company's EBITDA and FFO.[39] As discussed above, the Company's EBITDA and FFO were overstated throughout the Class Period as a direct result of Defendants' wrongdoing. Specifically, the Company's round-trip transactions with distressed tenants allowed the Company to avoid recording impairment charges and write-offs of rent receivables, which if recorded would have decreased the Company's EBITDA and FFO. Also, as a result of Defendants' intentional delay of the $280 million impairment charge related to Prospect and the Pennsylvania Properties, the Company's EBITDA and FFO was overstated during the Class Period.

---

[38] *See* Proxy Statement dated April 27, 2023 at pg. 37 and n.2.

[39] *See* Proxy Statement dated April 23, 2020 at pg. 27 (20% of bonus was based on "Debt/EBITDA Ratio," 50% of bonus was based on "Normalized FFO Per Share Growth," and remainder was based on other factors); Proxy Statement dated April 26, 2021 at pg. 31 (20% of bonus was based on "EBITDA/Interest," 50% of bonus was based on "Normalized FFO per Share," and remainder was based on other factors); Proxy Statement dated April 28, 2022 at pg. 37 (same); Proxy Statement dated April 27, 2023 at pg. 28 (same).

146.   Similarly, the Company's performance-based "stock award" plan was based primarily on the Company's EBITDA, FFO, and volume of acquisitions during the year.[40] EBITDA and FFO were overstated throughout the Class Period as discussed above. Also, the Company's acquisition activity was overly aggressive and included acquisitions even where the acquired properties would be leased to distressed tenants that could not afford the lease payments. Those acquisitions contributed to stock awards granted during the Class Period.

147.   The ratio of performance-based compensation to non performance-based compensation was significant, with the former eclipsing the latter by a wide margin each year for Defendants Aldag and Hamner. This outsized ratio provided a strong motive for Defendants Aldag and Hamner to engage in misconduct. They had a motive to overstate the Company's EBITDA and FFO, and engage in questionable acquisitions, to receive significantly heightened compensation.

148.   These same motives likely affected Defendant Hanna. His compensation is not publicly disclosed. However, the Company disclosed that the "overwhelming majority of our [executives'] compensation is tied to formulaic [performance-based]

---

[40] *See* Proxy Statement dated April 23, 2020 at pg. 29 (stock distribution plan was based on "EBITDA," "Acquisitions," and "ROE," *i.e.*, return on equity); Proxy Statement dated April 26, 2021 at pg. 31 (30% of stock distribution plan was based on "FFO per Share Growth," 40% was based on "EBITDA," and 30% was based on "Acquisitions); Proxy Statement dated April 28, 2022 at pg. 37 (same); Proxy Statement dated April 27, 2023 at pg. 28 (same).

incentives."[41]

149.    Defendants Aldag and Hamner accumulated massive amounts of aggregate stock holdings as a result of their receipt of shares year after year. The value of Defendant Aldag's shares reached at least as high as $69 million during the Class Period, and Defendant Hamner's holdings reached at least as high as $39 million. The following chart summarizes their holdings during the Class Period:

| Date | Common Stock Holdings | Defendant Aldag | Defendant Hamner |
|---|---|---|---|
| March 20, 2020[42] | Number of shares held | 2,700,478 | 1,608,192 |
| | **Value of shares held** | **$37,995,725** | **$22,627,261** |
| | | | |
| March 29, 2021[43] | Number of shares held | 2,997,608 | 1,310,909 |
| | **Value of shares held** | **$63,339,457** | **$27,699,507** |
| | | | |
| March 29, 2022[44] | Number of shares held | 3,253,469 | 1,816,847 |
| | **Value of shares held** | **$69,917,049** | **$39,044,042** |

150.    In light of their large stock holdings, Defendants' personal wealth stood to rise and fall in direct tandem with increases and decreases in the Company's stock price. Thus, Defendants Aldag and Hamner had an additional motive (beyond bonuses) to engage in fraud. They had a motive to misrepresent the Company's

---

[41] *See* Proxy Statement dated April 28, 2022 at pg. 31. Other Proxy Statements throughout the Class Period contained similar language.

[42] *See* Proxy Statement dated April 23, 2020 at pg. 42. The Proxy reported holdings as of March 20, 2020. The market price of the Company's common stock on that date was $14.07 per share.

[43] *See* Proxy Statement dated April 26, 2021 at pg. 49. The Proxy reported holdings as of March 29, 2021. The market price of the Company's common stock on that date was $21.13 per share.

[44] *See* Proxy Statement dated April 28, 2022 at pg. 52. The Proxy reported holdings as of March 29, 2022. The market price of the Company's common stock on that date was $21.49 per share.

financial position to artificially inflate the Company's stock price and, in turn, increase their wealth. Defendant Hanna's aggregate stock holdings are not publicly disclosed in the Company's proxy statements. However, based on information in his Forms 4 (statement of changes in stock holdings) filed with the SEC during the Class Period, his stock holdings were significant and provided a similar motive to engage in fraud.

151.    Each of the Individual Defendants also sold material amounts of Medical Properties stock during the Class Period, generating significant cash proceeds to add to their personal wealth. Throughout the Class Period, Defendant Aldag sold shares totaling $37.6 million in aggregate cash proceeds, Defendant Hamner sold shares totaling $18.6 million in aggregate cash proceeds, and Defendant Hanna sold shares totaling $1.1 million in aggregate cash proceeds.[45]

## SUMMARY OF SCIENTER ALLEGATIONS

152.    The facts detailed above and summarized below, when viewed holistically and together with the other allegations in this Consolidated Amended Complaint, establish a strong inference that each of the Defendants knew or were severely reckless in not knowing that each of the misrepresentations and omissions alleged herein would be, and were, false or misleading to investors at the time they were made.

---

[45] Share sale data was obtained from the Individual Defendants' Forms 4 filed with the SEC throughout the Class Period.

153.   At all relevant times, each of the Defendants knew or recklessly disregarded that their statements and omissions during the Class Period were false or misleading to investors at the time they were made. As alleged above, Defendants made materially false and misleading statements, and/or failed to disclose, inter alia, that: (i) many of its tenants were financially distressed and could not make their scheduled lease payments; (ii) the Company masked the distressed state of its tenants by utilizing "uncommercial transactions," which were essentially round-trip transactions that allowed tenants to meet their lease payment obligations in the short-term; (iii) the Company's tactics were used to avoid recording asset impairment charges and write-offs of rent receivables that were otherwise required; (iv) the Company intentionally delayed recording a $283 million impairment charge related to Prospect and the Pennsylvania Properties, which was belatedly recorded at the end of the Class Period; and (v) the Company failed to record needed impairment charges with respect to other tenants beyond Prospect and the Pennsylvania Properties. As a result of these issues, the Company's financial statements and SEC filings were materially false and misleading throughout the Class Period.

154.   In summary of and in addition to the facts more fully discussed above, Defendants' scienter is evidenced by the following facts, among others.

**A.**  **The Individual Defendants Were Entitled to Receive Substantial Performance Based Compensation Based on the Company's Net Earnings and Volume of Acquisitions Which, Absent Defendants' Alleged Misconduct, Would Have Been Substantially Reduced or Lost Entirely**

155.   The Individual Defendants and other Medical Properties executives had a financial motive to engage in the wrongdoing alleged herein. The Individual Defendants and other executives received performance-based compensation that significantly exceeded their non performance-based compensation each year during the Class Period. The Company's performance-based compensation plan was tied largely to the Company's net earnings, which were inflated due to Defendants' failure to record necessary impairment charges. The performance-based compensation plan was also tied to the volume of acquisitions the Company made each year, providing an incentive for executives to seek and/or approve acquisitions of hospital facilities even where the operators of the hospitals were distressed and were unlikely to make their lease payments on a long-term basis.

156.   The Individual Defendants also accumulated massive amounts of aggregate stock holdings as a result of their receipt of shares from the Company year after year. In light of their large, accumulated holdings, Defendants' personal wealth stood to rise and fall in direct tandem with increases and decreases in the Company's stock price.

157.   Further, the Individual Defendants also sold significant amounts of stock

during the Class Period, generating millions of dollars of cash proceeds.

**B.    The Findings by the Rhode Island Attorney General Are Strongly Indicative of Scienter**

158.   Courts recognize government actions and investigations can support a strong inference of scienter.

159.   As alleged above, on June 1, 2021, the Rhode Island Attorney General issued a "Decision" in a hospital change-of-ownership proceeding noting serious financial shortfalls at Prospect. The government scrutiny of Prospect's financial struggles – a key issue in this case – further contributes to a strong inference of Defendants' scienter.

**C.    Several Third Party Observers Criticized the Company's Use of Round-Trip Transactions to Help Tenants Make Rent Payments**

160.   As alleged above, several third parties including Viceroy, *The Wall Street Journal*, and a publication cited by Senator Grassley were critical of Medical Properties' use of round-trip transactions to help its tenants make rent payments. These critiques further support a strong inference of Defendants' scienter.

161.   Also, the Private Equity Stakeholder Project, a non-profit group, stated that the sale-leaseback transaction between Medical Properties and Prospect left Prospect in a worse financial position than it was in prior to the transaction, and that Prospect's ability to pay rent to Medical Properties was tenuous.

D.     **The Size and Timing of the $283 Million Impairment Charge Support a Strong Inference of Scienter**

162.   Defendants belatedly recorded the $283 million impairment charge related to Prospect and the Pennsylvania Properties in Q4 2022, long after Defendants became aware of Prospect's financial struggles.

163.   The timing of the charge was suspicious because it came on the heels of heavy scrutiny from Viceroy and others.

164.   Also, Defendants waited until Prospect *actually missed* rent payments before recording the impairment charge. Defendants looked only to Prospect's actual rent default when deciding to record an impairment charge. Under GAAP, Defendants had a duty to look to other factors in advance of an actual default, including Prospect's weakening financial condition. Defendants ignored those factors, contributing to an inference of scienter.

165.   Further, the $283 million impairment charge was material relative the overall value of Prospect-related lease assets recorded on Medical Properties' balance sheet. For example, the $171 million impairment charge specific to the Pennsylvania Properties represented a 41% reduction to the $420 million carrying value of the Pennsylvania Properties. Defendants cannot credibly assert that the need for a write down of that high a percent arose quickly and unexpectedly.

**E.    Leadership Changes at Medical Properties Further Support a Strong Inference of Scienter**

166.    On February 23, 2023, the day after the Class Period ends, Mr. McLean, the Company's Co-Founder, Executive Vice President, COO, and Secretary, resigned with little explanation. On that same day, the Company filed a Form 8-K announcing its $283 million impairment charge related to Prospect and the Pennsylvania Properties. The timing of McLean's departure, on the heels of the Viceroy Report and in conjunction with the $283 million impairment charge, is indicative of a remedial measure that further supports a strong inference of scienter. This type of "house-cleaning" does not typically follow innocent instances of mismanagement.

## LOSS CAUSATION

167.    As a direct result of Defendants' unlawful conduct, the price of Medical Properties stock was artificially inflated throughout the Class Period.

168.    Plaintiff and Class members unknowingly and in reliance upon the integrity of the market purchased the Company's stock at artificially inflated prices. But for Defendants' unlawful conduct, Plaintiff and Class members would not have purchased the stock, or would not have paid the prices they paid for the stock.

169.    The truth regarding Defendants' misrepresentations and omissions was revealed through multiple corrective disclosures.

170.    First, on January 26, 2023, the Viceroy Report revealed the distressed state of the Company's tenants, the Company's use of round-trip transactions to

bolster lease payments from tenants, and the fact that those transactions were designed to mask the need for impairment charges.

171.   Second, on February 23, 2023, the Company filed a Form 8-K announcing its $283 million impairment charge related to Prospect and the Pennsylvania Properties. The Company also issued a separate Form 8-K on that same day announcing that Mr. McLean, the Company's Co-Founder, Executive Vice President, COO, and Secretary, was stepping down. The timing of his departure, on the heels of the Viceroy Report and in conjunction with the $283 million impairment charge, signaled to the market that the Company's asset impairment issues may be more serious than the Company had been portraying.

172.   These corrective disclosures revealed the truth about the state of the Company's tenants and impairments in the value of the Company's real estate assets.

173.   The corrective disclosures caused the Company's stock price to decline precipitously, as set forth above. The declines in stock price are attributable to the market absorbing information that corrected the Company's previous misrepresentations and omissions.

174.   Defendants' misrepresentations and omissions directly and proximately caused an artificial inflation in the Company's stock price. The corrective disclosures caused a reversal of the artificial inflation.

175.   It was foreseeable to Defendants that their misrepresentations and

omissions would lead to artificial inflation in the value of the Company's stock price. It was also foreseeable that corrective disclosures revealing the truth about the misrepresentations and omissions would cause the stock price to decline.

176. Plaintiff and the Class suffered economic losses when the price of the Company's stock fell in response to the corrective disclosures.

## **APPLICABILITY OF THE PRESUMPTION OF RELIANCE**

177. Plaintiff invokes the presumption of reliance established by the fraud-on-the-market doctrine.

178. The market for the Company's securities was open, well-developed, and efficient at all times throughout the Class Period.

179. As a result of the misleading statements and omissions alleged herein, the Company's securities traded at artificially inflated prices throughout the Class Period.

180. Plaintiff and Class members purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the securities. The market price was reflective of all material publicly available information disseminated by the Company and other sources.

181. The market for the Company's securities was an efficient market for the following reasons, among others.

182. Medical Properties common stock met the requirements for listing on a

public stock exchange. The stock was listed and actively traded on the NYSE, a highly efficient and automated market, throughout the Class Period.

183.   Medical Properties shares were highly liquid, and traded with moderate to heavy volume throughout the Class Period.

184.   As a registered and regulated issuer of publicly held securities, Medical Properties filed periodic reports with the SEC, including but not limited to Forms 10-K, 10-Q, and 8-K.

185.   Medical Properties was followed by securities analysts at various brokerage firms, who wrote reports about the Company. Medical Properties disclosed that it was covered by analysts at BofA Securities, Barclays, Colliers Securities, Credit Suisse, Deutsche Bank, Green Street, Jefferies, J.P. Morgan, KeyBanc Capital Markets, Mizuho Securities USA, Raymond James, RBC Capital Markets, Stifel, Truist Securities, and Wells Fargo.[46]

186.   Many of the analysts' reports were distributed to the brokerage firms' sales forces. Certain analysts' reports also entered the public marketplace.

187.   The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities.

188.   Plaintiff and Class members purchased, acquired, and/or sold Medical Properties securities between the time Defendants misrepresented and omitted

---

[46] *See* https://www.medicalpropertiestrust.com/analysts, last visited Aug. 14, 2023.

material facts and the time the truth was revealed through the corrective disclosures. Plaintiff and Class members had no knowledge of the misrepresentations and omissions until the truth was revealed through the corrective disclosures.

189.   Based upon the foregoing, Plaintiff and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine.

190.   A class-wide presumption of reliance is also available under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because Plaintiff's claims are grounded in large part on omissions. Defendants omitted, among other things, the distressed state of its tenants, the Company's use of round-trip transactions to bolster lease payments from tenants, and the need to record impairment charges. Under *Affiliated Ute*, because this action involves material omissions, proof of actual reliance on an affirmative false statement or omission is not a prerequisite to recovery. All that is necessary is that the omitted facts were material in the sense that a reasonable investor might have considered them important in making an investment decision. Given the importance of the omitted information alleged herein, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

191.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Medical

Properties common stock during the Class Period, and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company during the Class Period, members of their immediate families, the Defendants' legal representatives, heirs, successors, or assigns, and any entity in which Defendants had or have a controlling interest.

192.   Throughout the Class Period, the Company's outstanding equity securities consisted of common stock. Preferred stock was authorized, but no preferred shares were issued or outstanding.

193.   Numerosity: Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Medical Properties stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through discovery, Plaintiff believes there are thousands or more members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Medical Properties or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

194.   Commonality: Fed. R. Civ. P. 23(a)(2). There are many questions of "law or fact" common to the Class for purposes of Rule 23(a)(2), including but not limited to:

a.       whether the Forms 10-K and 10-Q filed during the Class Period contained misleading statements and omissions;

b.       whether those misleading statements and omissions were material;

c.       whether each of the Individual Defendants had a role in preparing, approving, or disseminating the misleading statements and omissions;

d.       whether each of the Defendants acted knowingly or recklessly for purposes of establishing scienter; and

e.       whether the false statements and omissions caused legally cognizable damages, and if so, what class-wide model should be used to measure those damages.

195.   Typicality: Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the members of the Class, as all Class members were similarly affected by Defendants' wrongful conduct. The claims of Plaintiff and all other Class members are derived from the same operative facts. Plaintiff and the other Class members were deceived by the same underlying misrepresentations and omissions, which were relayed to the Class as a whole and were incorporated into the price of the Company's stock. Plaintiff and the other Class members have the same basic legal claims against Defendants.

196.   Adequacy of Representation: Fed R. Civ. P. 23(a)(4). Plaintiff will fairly

and adequately protect the interests of the Class, and has retained counsel competent and experienced in securities class action litigation. Plaintiff's counsel have the financial and personnel resources to litigate this matter through all phases of pretrial litigation, trial, and any necessary appeals. Neither Plaintiff nor its counsel have any interests that are contrary to, or in conflict with, those of the Class.

197. <u>Predominance: Fed. R. Civ. P. 23(b)(3)</u>. Defendants engaged in a common course of conduct directed toward all Class members equally. The common issues identified in the commonality section above, among others, predominate over any issues affecting only individual Class members. The common issues hinge upon Defendants' conduct rather than the conduct of any individual Class member. Adjudication of the common issues in a single action has important and desirable advantages that will lead to judicial economy.

198. <u>Superiority: Fed. R. Civ. P. 23(b)(3)</u>. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of Class members through separate individual proceedings would be impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small relative to the expense and burden of individual litigation, it would be impracticable for each Class member to proceed in an individual proceeding to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

199.   The statutory safe harbor for forward-looking statements under certain limited circumstances does not apply to any of the misleading statements and omissions alleged herein.

200.   The statements alleged to be false or misleading all relate to then-existing facts and conditions.

201.   To the extent certain of the misleading statements alleged herein may be characterized as forward looking, they were not expressly identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements.

202.   To the extent that the statutory safe harbor is determined to apply to any false statements pleaded herein, Defendants are nevertheless liable for those statements because at the time each statement was made, the speaker had actual knowledge that the statement was false or misleading.

### COUNT I
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

203.   Plaintiff repeats and re-alleges each allegation contained above as if fully set forth herein.

204.   This Count is asserted against all Defendants and is based upon Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

205.   During the Class Period, Defendants engaged in a plan, scheme, and course of conduct pursuant to which they knowingly or recklessly engaged in acts and practices that operated as a fraud and deceit upon Plaintiff and other Class members; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.

206.   Defendants' scheme was intended to and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate and maintain the market price of Medical Properties securities; and (iii) cause Plaintiff and other Class members to purchase or otherwise acquire Medical Properties securities and stock options at artificially inflated prices.

207.   In furtherance of their unlawful scheme, plan, and course of conduct, each Defendant participated in the misconduct alleged herein.

208.   Pursuant to the above plan, scheme, and course of conduct, each Defendant participated directly or indirectly in the preparation and/or issuance of the relevant SEC filings, press releases, and other statements described herein, including statements made to securities analysts that were designed to influence the market for

Medical Properties securities. Such SEC filings, press releases, and other statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Medical Properties' finances and business operations.

209.   Each Defendant had knowledge of the materially false and misleading statements and omissions, and intended for Class members to rely on them. In the alternative, each Defendant acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made. Defendants' acts and omissions were committed willfully or with reckless disregard for the truth.

210.   Each Defendant knew or recklessly disregarded that material facts were being disseminated by others, and failed to correct the misstatements despite a duty to do so.

211.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.

212.   Defendants are liable both directly and indirectly for the wrongs complained of herein. Defendants were able to, and did, directly or indirectly, control the content of the statements regarding the Company's financial affairs.

213.   As executive officers of Medical Properties charged with overseeing financial reporting, the Individual Defendants had knowledge of the details of the

Company's internal financial matters. The Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's business, operations, and financial condition.

214.   As a result of the dissemination of the misleading statements and omissions alleged herein, the market price of the Company's securities was artificially inflated throughout the Class Period.

215.   In ignorance of the adverse facts concerning the Company's financial condition, Plaintiff and Class members purchased or otherwise acquired the Company's securities at artificially inflated prices. Had Plaintiff and Class members known the truth, they would not have purchased the securities, or would not have purchased them at the inflated prices that were paid.

216.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

217.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## (Against the Individual Defendants)

218.   Plaintiff repeats and re-alleges each allegation contained above as if fully

set forth herein.

219.   During the Class Period, the Individual Defendants participated in the operation and management of Medical Properties, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

220.   The Individual Defendants were responsible for overseeing the Company's financial reporting.

221.   Defendants Aldag and Hamner signed two Certifications attached to each Form 10-K and 10-Q filed with the SEC throughout the Class Period: (i) a Sarbanes-Oxley Certification stating that the "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company," and (ii) a Certification pursuant to Rule 13a-14(a) of Securities Exchange Act of 1934 stating that, among other things, "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

222.   Defendant Hanna signed all Forms 10-K and 10-Q filed with the SEC throughout the Class Period.

223.   Because of their senior positions and responsibility for financial reporting, the Individual Defendants knew or recklessly failed to know that misrepresentations and omissions were being disseminated in the Company's SEC

filings and press releases throughout the Class Period.

224.   As senior officers of a public company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations. The Individual Defendants also had a duty to correct any public statements issued by others.

225.   Because of their positions within the Company, the Individual Defendants were able to, and did, control the contents of the various SEC filings and press releases disseminated to the market during the Class Period. They also controlled other personnel who had roles in preparing or disseminating the false and misleading statements alleged herein.

226.   The Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.

227.   The Individual Defendants were "controlling persons" of Medical Properties within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities.

228.   Each of the Individual Defendants acted as a controlling person of Medical Properties. By reason of their senior management positions, each Individual Defendant had the power, authority, and ability to direct the actions of the Company to engage in the unlawful acts and conduct alleged herein. Each Individual Defendant

exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff complains.

229.   By reason of the above, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by themselves and the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendants as follows:

a.      Determining that the action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

b.      Awarding compensatory damages in favor of Plaintiff and the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

d.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest; and

e.      Awarding such other relief as the Court may deem just and proper.

# JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.


Dated: September 22, 2023        Respectfully submitted,

/s/ Jon Mann
Chris T. Hellums (ASB-5583-L73C)
Jonathan S. Mann (ASB-1083-A36M)
Austin B. Whitten (ASB-7228-K13Y)
**PITTMAN, DUTTON, HELLUMS,
BRADLEY & MANN P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
Email: chrish@pittmandutton.com
     jonm@pittmandutton.com
     austinw@pittmandutton.com

*Liaison Counsel for the Proposed Class*

Michael Dell'Angelo (*pro hac vice*)
Andrew Abramowitz (*pro hac vice forthcoming*)
James Maro (*pro hac vice forthcoming*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: mdellangelo@bm.net
     aabramowitz@bm.net
     jmaro@bm.net

*Lead Counsel for the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2023, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will provide notification to all counsel of record.

*/s/ Jon Mann*
Jonathan S. Mann