FILED

2024 Sep-26  AM 08:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

**FIYYAZ PIRANI,**
     Plaintiff,

**v.**

**MEDICAL PROPERTIES TRUST, INC.,** *et al.*,
     Defendants.

**Case No. 2:23-cv-486-CLM**

## MEMORANDUM OPINION

Medical Properties Trust ("MPT") buys then leases healthcare facilities. In July 2019, MPT bought 16 facilities from Prospect Medical Holdings ("Prospect") for $1.55 billion, and Prospect agreed to lease space from MPT for 15 years—a 'sale-leaseback' transaction. Prospect struggled to pay its rent. So in February 2023, MPT announced two impairment charges related to the Prospect properties: a $171 million decrease in the value of four Prospect hospitals in Pennsylvania, and a $112 million write off for unpaid rent. MPT's stock price fell 17.5% over the next week.

Fiyyaz Pirani traded MPT securities from July 2019 to February 2023. Pirani says that, during that time, MPT knew that Prospect was struggling financially and hid the 'uncommercial transactions' it used to prop up Prospect to hide the looming impairment charges. Pirani says that MPT's failure to disclose Prospect's struggles—thus delaying the impairment charge—injured him and other investors who traded MPT securities during that time.

So Pirani sues MPT and its CEO, CFO, and CAO on behalf of a purported class of investors under the Securities Exchange Act. MPT moves to dismiss Pirani's amended complaint. (Doc. 30). As explained within, the court finds that Pirani's amended complaint fails to meet the "tripled-layered pleading standard" for private securities plaintiffs. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). The court also finds that Pirani's failure to adequately plead loss causation cannot be fixed by amendment. So the court will **DISMISS WITH PREJUDICE** Pirani's amended complaint.

# BACKGROUND

## A. Impairment Charges

The court starts with a quick accounting primer. Companies assign a "carrying value" to an asset and record that value on the company's balance sheet. When the company determines that the current fair value of the asset is less than the assigned carrying value, the company records the difference—*i.e.*, the lost value—as an "impairment" charge.

This case is about two impairment charges that MPT announced on February 23, 2023. Both impairments relate to properties that MPT bought from Prospect, then leased to Prospect. The first was a $171 million decrease in the recorded value of four Prospect hospitals in Pennsylvania. The second was a $112 million decrease in rent payments that MPT expected Prospect to pay. This is how MPT recorded the impairment charges in the February 23 press release:

| (Amounts in thousands, except for per share data) | For the Three Months Ended | | | |
|---|---|---|---|---|
| | December 31, 2022 | | December 31, 2021 | |
| **FFO information:** | | | | |
| **Net (loss) income attributable to MPT common stockholders** | $ | **(140,474)** | $ | **206,536** |
| Participating securities' share in earnings | | (567) | | (1,073) |
| Net (loss) income, less participating securities' share in earnings | $ | (141,041) | $ | 205,463 |
| Depreciation and amortization | | 98,891 | | 97,510 |
| Gain on sale of real estate | | (99) | | (43,575) |
| Real estate impairment charges | | 170,582 | | — |
| **Funds from operations** | $ | **128,333** | $ | **259,398** |
| Write-off of unbilled rent and other | | 3,390 | | 8,814 |
| Gain on sale of equity investments | | — | | (40,945) |
| Other impairment charges, net | | 112,368 | | 39,411 |
| Non-cash fair value adjustments | | 10,230 | | (5,430) |
| Tax rate changes and other | | 3,795 | | (7,950) |
| Debt refinancing and unutilized financing costs | | — | | 25,311 |
| **Normalized funds from operations** | $ | **258,116** | $ | **278,609** |
| Share-based compensation | | 12,377 | | 13,520 |
| Debt costs amortization | | 5,023 | | 4,968 |
| Rent deferral, net | | 514 | | 557 |
| Straight-line rent revenue and other | | (72,494) | | (81,909) |
| **Adjusted funds from operations** | $ | **203,536** | $ | **215,745** |

Pirani alleges that, until MPT revealed the impairments in the February 23rd press release, MPT hid (a) Prospect's financial struggles that led to the

impairment charges and (b) MPT's efforts to conceal the struggles. When the public found out, MPT's stock (traded as "MPW") dropped 17.5% within a week.

Among other reasons, MPT asks the court to dismiss this case because the market knew about the problems that led to the impairment charges before February 2023. MPT openly talked about Prospect's problems in 2022, and market analysts reported and questioned MPT about Prospect's problems in 2022. MPT argues that because the market knew about Prospect's financial struggles long before MPT reported the impairments on February 23, 2023, Eleventh Circuit precedent precludes a finding that the February 23rd announcement caused the 17.5% drop in stock value—meaning that MPT's announcement did not cause Pirani's alleged injury. *See Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (evidence that revealed information "[was] already public is fatal to the Investors' claim of loss causation").

The parties' arguments make two things important: (1) what MPT knew about Prospect's struggles before February 23, 2023, and (2) what the market knew about Prospect's struggles before February 23, 2023. Below, the court lays out the facts Pirani pleaded in his complaint about both issues and assumes they are true.[1] FED. R. CIV. P. 12(b)(6); *see, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The court also quotes public documents that the parties cite in the amended complaint, the motion to dismiss, and briefs if (a) the document contains facts about what MPT or the market knew about Prospect's financial trouble before February 23, 2023, and (b) neither party challenged the document's authenticity. *See SFM Holdings, Ltd. v. Banc. of AM. Sec. LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (court can consider SEC filings).

**A. MPT buys Prospect properties (July 2017)**

MPT buys and develops medical facilities on a net lease basis, meaning that MPT owns the property and leases building space to medical providers. On July 15, 2017, MPT announced that it bought 16 properties (14 hospitals and 2 behavioral health facilities) from Prospect for $1.55 billion. As part of the deal, Prospect agreed to lease much of the space for the next 15 years to

---

[1] The court short cites Pirani's Amended Complaint (doc. 28) as "AC."

operate hospitals. This "sale-leaseback" agreement was a common part of MPT's business model.

**B. Prospect's financial problems (2017—2023)**

1. <u>2019</u>: MPT and market analysts knew that making Prospect a long-term tenant carried risk. For example, three months before the sale-leaseback agreement, Moody's downgraded Prospect's rating based in part on Moody's concern about Prospect's business model for operating hospitals in California and Pennsylvania:

> Prospect's B3 Corporate Family Rating reflects the company's very high financial leverage, shareholder-friendly financial policies, and a history of failing to meet projections. The rating is also constrained by the company's high concentration of revenue and earnings in only a few markets, and significant reliance on Medicaid programs, particularly those in California and Pennsylvania. Moody's believes there is longer-term risk to relying heavily on state Medicaid programs due to state and federal budget constraints. Further, Moody's believes that hospital industry-wide challenges to growth and margin expansion, including weak patient volume trends and increasing cost pressures, will constrain organic earnings and cash flow growth going forward.

Moody's, *Moody's downgrades Prospect Medical Holdings, Inc.'s CFR to B3; outlook changed to negative*, (March 28, 2019) (cited in AC ¶ 94). While Moody's thought that Prospect accepting MPT's purchase money could help Prospect's liquidity concerns, Moody's was still concerned about Prospect's operation of hospitals in California and Pennsylvania:

> Moody's Investors Service commented that Prospect Medical Holdings, Inc.'s ("Prospect Medical") announcement that Medical Properties Trust, Inc. will invest $1.55 billion in it through a sale-leaseback of the majority of Prospect Medical's facilities provides a meaningful liquidity boost. Prospect Medical expects to use the funds to retire the company's existing term loan debt, which stood at $1.1 billion as of March 31, 2019. However, the sale-leaseback

> ==transaction does not address the company's continuing operating challenges and lease-adjusted leverage will likely remain high==. At this time, there is no immediate impact on Prospect Medical's B3 Corporate Family Rating or its negative rating outlook.

Moody's, *Prospect Medical's sale-leaseback improves liquidity, however operating challenges remain*, (July 16, 2019) (highlight added).

2. <u>2020</u>: COVID hit the next year. The market continued to question Prospect's business model and, thanks in part to COVID, started questioning Prospect's ability to pay MPT rent. For example, the Private Equity Stakeholder Project ("PESP") said this about Prospect in July 2020:

> In 2019, in an effort to pay down some of the existing $1.1 billion debt it had accrued in part to fund dividends, Prospect sold much of its hospitals' real estate to health care REIT Medical Properties Trust and leased it back. Prospect and Leonard Green have characterized the sale-leaseback transaction as beneficial to the hospital company, though this is misleading; the sale-leaseback merely replaced debt with lease liabilities and left Prospect with fewer assets.

> The terms of Prospect's new lease are onerous; Prospect is paying more in rent and interest to MPT than it would be paying had it not undertaken the sale-leaseback transaction. Before the transaction, Prospect had $1.35 billion in debt (including $207 million under revolving credit facility). After the transaction, Prospect had $257 million in debt (including $70 million under revolving credit facility) and $1.34 billion in lease liabilities. . . .

> Prospect's liabilities ($2.83 billion) dramatically exceeded its assets ($1.86 billion) as of September 2019; and Prospect's stated assets are somewhat fictitious, as the company still lists its real estate on its balance sheet even through it sold most of it to Medical Properties Trust last year.

> ==Prospect generated at most $61 million in EBITDA in 2019 (and -$70.7 million in EBITDA when discontinued operations are included).==

> By comparison, Prospect pays Medical Properties Trust around $116 million per year in rent. Even before COVID-19, it was not clear how Prospect would be able to pay the rent it owes Medical Properties Trust without incurring additional debt.

Private Equity Stakeholder Project, *Broken Promises: Regulators Question Leonard Green's Investment in Prospect Medical Holdings*, (July 31, 2020) (highlight added) (cited in AC ¶ 95).

Later that year, ProPublica published a story about Prospect's failure to pay bills for promised repairs and necessities like gasoline for ambulances, sponges, IV fluids, and medical dressing. ProPublica, *Investors extracted $400 million from a Hospital Chain that Sometimes Couldn't Pay for Medical Supplies or Gas for Ambulances*, (Sept. 30, 2020) (cited in AC ¶ 96). Like Moody's and PESP, ProPublica openly questioned whether the sale-leaseback agreement with MPT helped Prospect:

> Eager to raise capital, Prospect sold its land and buildings last fall in a sale-leaseback transaction that allowed the operations to remain in the facilities. The company raised $1.55 billion. Prospect used much of the cash to pay off its loans. It had effectively replaced its debt payments with rent payments.
>
> The sale of the land and buildings brought in much needed cash and stabilized the company. But it also meant that Prospect had shed by far its biggest asset, sharply reducing the value of the company.

*Id.*

3. <u>2021</u>: ProPublica followed up in February 2021 with a story about the Rhode Island Attorney General's attempt to block a private equity firm from selling its majority stake in Prospect, thus putting two Rhode Island hospitals at risk. (AC ¶ 97). In June 2021, the Rhode Island Attorney General published a decision that noted Prospect "has sold substantially all its real property to [MPT]" and thus Prospect "will not be able to find operational cash when it is needed." (AC ¶ 98). The Attorney General's expert concluded that Prospect would face a "liquidity crisis" within 18 to 24 months that would threaten Prospect's survival. (AC ¶ 100).

4. 2022: Prospect's problems in Pennsylvania grew in 2022. In March 2022, PESP relayed an earlier report by *The Philadelphia Inquirer* that Prospect laid off about 100 employees at one Pennsylvania hospital; closed the maternity ward at another; and, suspended all impatient service at another. (AC ¶ 104). PESP reported that the state was supplying nurses and therapists to alleviate Prospect's staffing shortages. Private Equity Stakeholder Project, *Prospect Medical Holdings Continues to Sell Off its Hospitals, Leaving Patient Care in Question*, (March 9, 2020). PESP further reported that Prospect used the $1.55 billion it received from MPT in 2019 to pay off loans it took in 2018 and pay a $457 million dividend to investors. *Id.*

The market noticed. In September 2022, Credit Suisse warned of a looming rent default by Prospect. (Doc. 30-13). Credit Suisse said that Prospect was facing a "dire financial situation, string of executive layoffs, staff shortages and recent legal action by Delaware County in Pennsylvania to force Prospect to keep essential parts of its hospitals running." (*Id.* pp. 4-5). Credit Suisse predicted that a lease default would result in an operator change, and "we find it hard pressed to see how a new operator would be able to pay current rent rates given the poor financial condition and operating challenges at quite a few of the Prospect operated hospitals that are owned by [MPT]"—particularly the Pennsylvania hospitals because they could choose "a change in operations to an operator with a 'not-for-profit' mission in the Pennsylvania market." (*Id.* p. 5). Credit Suisse speculated that these issues, plus Prospect's inability to sell two of its operations, led MPT to give Prospect a $100 million bridge loan in the Second Quarter ("Q2") of 2022. (*Id.*). Credit Suisse predicted a "grey sky" scenario of Prospect bankruptcy leading to a 40% rent cut for new operators "or even an initial large rent deferral." (*Id.*).

In December, Credit Suisse lowered its target price for MPT stock (MPW) from $17 to $11, based in part on the increased likelihood that Prospect would not pay rent in Pennsylvania:

> We have also assessed tenant credit risk around Prospect Medical Holdings ("Prospect"), MPW's #4 tenant at 11.2% of 3Q22 revenues. Our recent conversations with management suggest that the current situation regarding Prospect's Pennsylvania assets will lead to earnings dilution, which we have accounted for in our updated model. Prospect's Pennsylvania assets leased from

MPW are currently underperforming, as seen from Prospect's TTM EBITDAR rent coverage (reported on a 1-Q lag) declining to -0.8x in 3Q22 from 0.6x in 2Q22 (Pennsylvania assets were not included in the figure in 2Q22 but were included in 3Q22). Per management, Pennsylvania represents 20% - 25% of Prospect's revenues to MPW. Prospect's efforts to turn the Pennsylvania assets around have been met by resistance from local healthcare regulations, prompting a decision by MPW to exit the market via a transfer of the income producing assets to Prospect for what we expect to be a stake in Prospect's operations. MPW has owned stakes in its tenants before and does have a track record of selling such stakes at an attractive profit. However, the near-term impact of such a transfer would likely be dilutive to earnings.

(Doc. 30-14, p. 4) (highlight added). The court highlights the sentence above because it reveals a fatal flaw in Pirani's case: MPT management was talking to market analysts about Prospect's rent problems in Pennsylvania—and the tactics MPT might use to address Prospect's problems—several months before MPT announced the impairment charge on February 23, 2023.

    5. MPT's statements in 2022: As Credit Suisse reported, MPW (a) loaned Prospect another $100 million in Q2-2022, then (b) reported a -0.8% rent coverage in Q3-2022 when it added Pennsylvania assets to its reported rental coverage. MPT management and market analysts talked about both issues during MPT's Q3-2022 earnings call. (Doc. 34-1). Here's what CFO Steven Hammer said in his prepared remarks about the $100 million loan and its impact on a possible impairment of Prospect properties:

On our second quarter earnings call, we said that while we were unable to discuss certain potential and confidential Prospect transactions that we had reason to believe that such transactions would result in MPT's avoidance of material impairment or loss with respect to Prospect. We continue to be prohibited from disclosures about confidential discussions but we remain cautiously optimistic about repayment in the relatively near-term of the related second quarter $100 million increase in our original 2019 first lien mortgage loan. Of course, there is no assurance that

> any pending transactions, including possible repayments of
> mortgage loans in the near-term will occur.

(*Id.*, p. 8). During the subsequent Q&A, a market analyst for Mizuho Securities
asked MPT President and CEO Edward K. Aldag, Jr. about Prospect's ability
to make future rent payments:

> Q: Okay. That's helpful. And then just on Prospect, obviously you
> now included additional assets in that calculation of coverage.
> So we're seeing the negative coverage is there. But can you just
> help us understand all the sources of capital that Prospect has
> and kind of your rent is current today? What are your – what's
> your confidence around that rent being current going forward?
>
> A: So that's a good question. So we included Pennsylvania in the
> coverage this time, and it's important to note that the California
> facilities continue to perform at acceptable levels. The
> Pennsylvania facilities are not where we would like them to be,
> certainly disappointed in where they are. I think that the
> changes or some of the changes that Prospect has going on at
> Pennsylvania is certainly in the right direction, haven't borne
> the fruit that we certainly would hope that they would at this
> particular time. But remember, they've got the managed care
> business, which is extremely profitable. That generates strong
> cash flow for them and as Steve pointed out earlier, there are
> potential transactions out there that we're not in a position
> where we can comment any further than that on that gives us
> comfort at this particular time. And we remained comfortable
> in the California facilities.

(*Id.*, p. 10) (highlight added).

## C. The Viceroy Report (January 2023)

Viceroy Research Group published a 33-page report about MPT on
January 26, 2023—about four weeks before MPT would announce the
impairments in its Q4-2022 and Full Year 2022 results. (Doc. 30-5).

In the first sentence, Viceroy acknowledged that it shorted MPW stock;
that is, Viceroy borrowed then sold MPW at a high price hoping to repurchase

the same amount of MPW stock at a lower price to pocket the difference. (*Id.* p. 2). Viceroy finished the first sentence by alleging that MPT had "engaged in billions of dollars of uncommercial transactions with its tenants and their management teams in order to mask a pervasive revenue round-robin scheme and / or theft." (*Id.*). Viceroy listed four types of "uncommercial transactions":

1. *Sale-Leasebacks*: MPT would buy property from "debt-crippled" vendors, who would then lease the property back from MPT;

2. *Cash-giveaways*: MPT would "engage[] in various transactions" in which MPT would not be fully repaid;

3. *Bailouts*: When a tenant couldn't pay rent, MPT would acquire equity in the tenant or give them loans so that the tenant could pay rent and MPT could avoid recording an impairment; and,

4. *Fake builds*: MPT take on construction projects to either siphon money away from MPT or to help distressed tenants pay for things like taxes, insurance, and maintenance that the tenant (not MPT) was contractually obligated to fund.

(*Id.*, pp. 2-3). Viceroy listed one or more examples of each transaction, with Prospect being the example of a bailout. (*Id.*, pp. 24-27).

Viceroy started its four-page discussion of Prospect by saying that Prospect was "borderline bankrupt" and had "landed itself in this position by selling off assets to MPW and paying its shareholders enormous dividends at the expense of the state." (*Id.*, p. 24). Viceroy quoted the already-mentioned Rhode Island Attorney General decision to support this statement. (*Id.*).

Viceroy then explained the 2019 sale-leaseback agreement by again citing the Rhode Island Attorney General's decision. (*Id.*, p. 25). Viceroy noted that the "Rhode Island Attorney General's investigation of Prospect's financials show clear signs of distress including a negative equity of >$1b." (*Id.*).

Viceroy next mentioned the $100 million loan that MPT added in 2022: "Never one to let circumstances stop them throwing good money after bad, MPW made a $100m mortgage loan to Prospect, secured against a California hospital, in Q2 2022 for unspecified reasons. We doubt the collectability of this loan." (*Id.*, p. 26). Viceroy pasted MPT's 2Q-2022 report to support this assertion:

Never one to let circumstances stop them throwing good money after bad, MPW made a $100m mortgage loan to Prospect, secured against a California hospital, in Q2 2022 for unspecified reasons. We doubt the collectability of this loan.

| | For the Six Months Ended June 30, | | |
| --- | --- | --- | --- |
| | 2022 | | 2021 |
| Land and land improvements | $ 34,204 | $ | 345,039 |
| Buildings | 290,256 | | 825,322 |
| Intangible lease assets — subject to amortization (weighted-average useful life of 20.1 years for 2022 and 45.0 years for 2021) | 16,949 | | 96,455 |
| Mortgage loans(1)(2) | 100,000 | | 1,090,400 |
| Investments in unconsolidated real estate joint ventures | 399,456 | | — |
| Investments in unconsolidated operating entities | 131,105 | | 845,646 |
| Liabilities assumed | (25,727) | | (65,411) |
| | 946,243 | | 3,137,451 |
| Loans repaid(1) | — | | (1,090,400) |
| Total net assets acquired | $ 946,243 | $ | 2,047,051 |

(1)  The 2021 column includes an £800 million mortgage loan advanced to the Priory Group ("Priory") in the first quarter of 2021 and converted to fee simple ownership of 35 properties in the second quarter of 2021 as described below.

(2)  In the 2022 second quarter, we increased our mortgage loan to Prospect Medical Holdings, Inc. ("Prospect") that was originated in 2019 and that is secured by a first lien on a California hospital. The loan bears interest at a current market rate plus a component of additional interest upon repayment, which is anticipated during the fourth quarter.

*Figure 49 – MPW Q2 2022 10-Q*

(*Id*.).

Viceroy next noted that Moody's had downgraded Prospect's credit rating to "junk status in March 2019," just before the sale-leaseback with MPT:



**Future Prospects**

Beyond its dire financial situation Prospect's credit rating is in the toilet after a series of bond issuances that prompted Moody's to downgrade their credit rating to junk status in March 2019 citing poor liquidity outlook and leverage levels[38]. The sale-and-leaseback agreement with MPW failed to materially change Moody's view on their "continuing operating challenges and lease-adjusted leverage"[39].

> **MOODY'S**
> **INVESTORS SERVICE**            🖨 Print  📄 Export PDF
>
> **Rating Action:** Moody's downgrades Prospect Medical Holdings, Inc.'s CFR to B3; outlook changed to negative
> 28 Mar 2019
>
> New York, March 28, 2019 — Moody's Investors Service (Moody's) today downgraded the ratings of Prospect Medical Holdings, Inc.'s ("Prospect"), including its Corporate Family Rating (CFR) to B3 from B2 RUR-Down and its Probability of Default Rating to B3-PD from B2-PD RUR-Down. The rating agency also downgraded Prospect's senior secured first lien term loan rating to B3 from B1 RUR-Down. Moody's changed the outlook, previously on review, to negative. These actions resolve the review for downgrade initiated on February 12, 2019.

*Figure 50 Moody's downgrades Prospect Medical Holdings, Inc.'s CFR to B3; outlook changed to negative*

Since the hospital company was reporting operating losses even with lower debt servicing, the new arrangement will push the losses wider and likely require restructuring of the expense base.

(*Id*., p. 27). Viceroy followed up the Moody's rating by noting that "Prospect's poor financial prospects are also reflected in regular media coverage of its facilities. ProPublica has penned several articles detailing the decline of its

hospitals including operational, hygiene, and staffing failures." (*Id.* (cleaned up)).

Viceroy concluded: "a round-tripping transaction appears to have actually worsened the financial wellbeing of an MPW client, despite providing short-term liquidity." (*Id.*).

### D. Prospect's Q4 and Full Year 2022 report (February 2023)

Prospect announced its Q4 and Full Year reports about four weeks later. In a press release attached to its Form 8-K, Prospect announced that:

> Fourth quarter 2022 net loss and full-year 2022 net income included a real estate impairment of approximately $171 million related to four properties leased to Prospect Medical Holdings ("Prospect") in Pennsylvania as well as a write-off of roughly $112 million in unbilled Prospect rent also included in Funds from Operations ("FFO") but excluded from normalized results[.]

(AC ¶ 85). Later in the announcement, MPT said this about the Pennsylvania properties:

> "The vast majority of our portfolio is positioned to support a significant inflation-based increase in cash rents for 2023," said Edward K. Aldag, Jr., Chairman, President, and Chief Executive Officer. "On the other hand, our initial outlook for this year contemplates a conservative scenario due to the underperformance of Prospect's Pennsylvania hospitals that we first communicated over a year ago, as well as the process by which we expect to recover our full investment in Prospect's Pennsylvania and Connecticut hospitals." . . .
>
> MPT plans to reallocate capital away from real estate leased to Prospect through the previously announced sale, predominantly for cash, of its Connecticut hospitals later this year, as well as by exercising lease provisions entitling it to the significant value embedded in Prospect's managed care platform. In order for this to occur, 12 to 18 months is necessary to allow for Prospect to recapitalize and prepare its managed care business for sale or recapitalization.

Medical Properties Trust, Inc., Form 8-K, Exhibit 99.1, pp. 1-2. (Feb. 23, 2023) (cited in AC ¶ 85).

On the same day, MPT announced that its co-founder and COO, Emmett E. McLean, would be leaving in September. (AC ¶ 86).

MPT filed its Form 10-K, which reported the Full Year 2022 results, on March 1, 2023. In it, MPT gave more details about the impairment charge:

> Prospect (like other healthcare systems around the world) struggled through the COVID-19 pandemic, starting in early 2020 and continuing through much of the 2022 first quarter with the impact from the Omicron variant. Although admissions, surgeries, and ER visits are back above pre-COVID levels at their California and Connecticut properties, Prospect's four Pennsylvania facilities are still trailing. Now with the impact of higher labor and other costs due to inflation, Prospect has experienced a decline in cash flows during 2022. Prospect has been working through various restructuring plans to manage their cash flow.
>
> Some of these plans have made it to the binding commitment stage, including the expected sale of their Connecticut properties to Yale New Haven Health ("Yale") announced in October 2022, while others have not.
>
> Until the 2022 fourth quarter, Prospect was current on its rent and interest obligations under the various agreements. However, with rent and interest now past due and certain of Prospect's restructuring plans yet to be finalized, we recorded an approximate $280 million impairment charge in the 2022 fourth quarter, as shown in "Real estate and other impairment charges, net" on the consolidated statements of net income. As part of this charge, we reduced the carrying value of the underperforming Pennsylvania properties by approximately $170 million (to approximately $250 million) and reserved all non-cash rent [due from Prospect] for a total of $112 million. We expect to record rent on our Prospect leases on a cash basis for the foreseeable future.

(AC ¶ 88).

### E. Falling stock price (February 23 to March 1, 2023)

MPW stock closed at $12.20 per share the day before MPT announced its Form 8-K, including the impairment. (AC ¶ 87). MPW fell to $11.14 by the close of February 23rd and fell to $10.07 at the close of March 1, 2023. (*Id*.).

### F. Pirani's lawsuit

Pirani alleges that he "unknowingly and in reliance upon the integrity of the market purchased [MPT's] stock at artificially inflated prices." (AC ¶ 168). Pirani says that he either would not have purchased the stock, or would have gotten it cheaper, had the market known about the misconduct revealed by the Viceroy Report and the February 23rd press release that announced the impairment charge. (AC ¶¶ 168-173). So Pirani sued MPT and its CEO (Edward K. Aldag, Jr.), its CFO (R. Steven Hamner), and its CAO (J. Kevin Hanna) under the Securities Exchange Act. The Defendants ask the court to dismiss Pirani's complaint under Rule 12(b)(6).

## STANDARDS OF REVIEW

### A. Rule 12(b)(6) generally

Rule 12(b)(6) allows the court to dismiss a complaint if it fails to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B. Pleading requirements under the PSLRA

As explained in Part A of the Discussion section, claims subject to the Private Securities Litigation Reform Act, Pub. L. No. 104–67, 109 Stat. 737 (1995) ("PSLRA") must satisfy three layers of pleading requirements.

1. *Rule 8(a)*: First is the general pleading requirement that the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but does demand more than "an unadorned, 'the-defendant-unlawfully-harmed-me' accusation." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Mere "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Id.*

2. *Rule 9(b)*: Second, the plaintiff must meet Rule 9's heightened requirements for pleading fraud by "stat[ing] with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). The complaint must set forth: (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and how they misled the plaintiff, and (4) what the defendants obtained as a result of the fraud. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

3. *PSLRA:* The PSLRA ratchets up Rule 9's pleading standard in two ways. First, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78*u*–4(b)(1)(B). Second, the complaint "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78*u*–4(b)(2).

## DISCUSSION

Pirani pleads two claims under the Exchange Act. In Count 1, Pirani alleges that all Defendants committed a fraud-on-the-market under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), as implemented by Securities and Exchange Commission Rule 10b-5. (AC ¶¶ 203-217). In Count II, Pirani alleges that the individual Defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (AC ¶¶ 218-229).

Proving a violation of Rule 10b-5 in Count I is the first element of proving a violation of § 20(a) in Count II. *See Carvelli*, 934 F.3d at 1330. So to survive Defendants' motion to dismiss both counts, Pirani must plead facts that would ultimately prove Defendants violated Rule 10b-5. That rule states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

In his response to Defendants' motion, Pirani says that "Defendants knew or should have known that their statements in MPT's 10-Ks and 10-Qs throughout the Class Period were false or misleading when made." (Doc. 33, p. 17). But Pirani's theory about precisely what was false or misleading, and how that falsity caused MPW's value to drop in February 2023, is somewhat Jekyll and Hyde—the theory changes depending on what element Pirani is trying to defend in light of Defendants' motion to dismiss.

1. *Everyone knew*: When discussing proof of falsity, for example, Pirani says that everyone in the market knew about Prospect's financial struggles for years, so MPT should have recorded the impairment charges before Q4-2022:

> Defendants argue that Plaintiff did not adequately plead details such as "when during the more than three years prior to the actual impairment such a charge should have been taken, why a charge was required under MPT's disclosed impairment methodology, or how much such a charge should have been." MTD at 10 (emphasis in original). That is incorrect. The AC alleged that impairment charges should have been recorded throughout the entire Class Period (the "when") because Defendants were aware of serious liquidity problems at MPT's tenants bearing on their ability to pay rent (the "why"). AC ¶¶ 8, 67, 91-109.

(Doc. 33, p. 23). Pirani similarly argues that 'everyone knew' when discussing his proof of scienter: "Defendants had access to abundant evidence of tenants' financial distress throughout the Class Period. AC ¶¶ 91-109." (Doc. 33, p. 35).

In both arguments, Pirani points to paragraphs 91-109 of his amended complaint. In those paragraphs, Pirani lays out the public reports from March 2017 through the end of 2022 that the court detailed earlier at pages 4-9.

2. *No one knew*: Yet, when Pirani defends his proof that Defendants' acts caused MPW's stock price to fall during the last week of February 2023, Pirani says that no one knew about Prospect's financial troubles, and MPT's efforts to help MPT overcome those struggles, until the Viceroy Report and MPT's impairment announcement revealed them to the market:

> Plaintiff alleged that MPT's February 23, 2023 impairment charge announcement revealed the truth (that MPT's assets were overvalued), and that MPT's stock price materially declined that same day after the announcement was released. AC ¶¶ 13, 87, 169-174.

(Doc. 33, p. 38). And indeed, in the paragraphs Pirani cites, Pirani pleaded that the Viceroy Report and the impairment announcement revealed facts that were unknown to the market:

> 169. The truth regarding Defendants' misrepresentations and omissions was revealed through multiple corrective disclosures.
>
> 170. First, on January 26, 2023, the Viceroy Report revealed the distressed state of the Company's tenants, the Company's use of round-trip transactions to bolster lease payments from tenants, and the fact that those transactions were designed to mask the need for impairment charges.
>
> 171. Second, on February 23, 2023, the Company filed a Form 8-K announcing its $283 million impairment charge related to Prospect and the Pennsylvania Properties. The Company also issued a separate Form 8-K on that same day announcing that Mr. McLean, the Company's Co-Founder, Executive Vice President, COO, and Secretary, was stepping down. The timing of his departure, on the heels of the Viceroy Report and in conjunction with the $283

million impairment charge, signaled to the market that the Company's asset impairment issues may be more serious than the Company had been portraying.

172. These corrective disclosures revealed the truth about the state of the Company's tenants and impairments in the value of the Company's real estate assets.

173. The corrective disclosures caused the Company's stock price to decline precipitously, as set forth above. The declines in stock price are attributable to the market absorbing information that corrected the Company's previous misrepresentations and omissions.

174. Defendants' misrepresentations and omissions directly and proximately caused an artificial inflation in the Company's stock price. The corrective disclosures caused a reversal of the artificial inflation.

(AC ¶¶ 169-174).

Defendants list several problems that Pirani's shifting theory causes in their motion to dismiss and reply brief. (Docs. 30, 34). The court limits its discussion to two: (1) Pirani's failure to meet the PLSRA's heighted pleading standard and (2) Pirani's failure to plead facts that would prove that MPT's statements or omissions caused its stock price to drop in February 2023.

### A. Deficient Pleading

Both of Pirani's claims are subject to three pleading requirements: Rule 8(a)'s general pleading standard, Rule 9(b)'s heightened pleading standard for fraud claims, and the PLSRA's special pleading standards. The Eleventh Circuit has explained the "triple-layered pleading standard" like this:

To survive a motion to dismiss, a securities-fraud claim brought under Rule 10b–5 must satisfy not only the run-of-the-mill federal notice-pleading requirements, *see* Federal Rule of Civil Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform

Act of 1995, 15 U.S.C. § 78u–4. Failure to meet any of the three standards will result in a complaint's dismissal.

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake"—which in the securities-fraud context, we've explained, requires a plaintiff to allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud.

The PSLRA—with some overlap—requires a complaint to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). It also requires, "with respect to each act or omission alleged," that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2)(A). The required state of mind, we have held, is an "intent to defraud or severe recklessness on the part of the defendant." And a "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute.

*Carvelli*, 934 F.3d at 1317-18 (some citations omitted).

Essentially, the "triple-layered pleading standard" requires Plaintiff to plead 10 distinct facts, all of which work together, depending on whether the Plaintiff is alleging Defendants made a false statement or Defendants omitted a material fact. The court lists the requisite facts below, starting with the facts subject to the heightened pleading standard (shaded in gray), followed by facts that are subject to Rule 8's general pleading standard:

| Rule 10b-5, Defendant made a False or Misleading Statement | |
|---|---|
| 1.  Content of the statement(s) that was made | |
| 2.  Location of the statement(s) that was made—*i.e.,* the particular document or oral statement | |
| 3.  Person who made the statement(s) | |
| 4. How the statement was false | |
| 5. How the statement misled investors | |
| 6.  What the Defendant received as a result of the statement | |
| 7.  Facts that create an inference that the Defendant acted with an intent to defraud or with severe recklessness | |
| 8.  How Plaintiff relied on the statement | |
| 9.  The Plaintiff's economic loss | |
| 10. How the statement caused the Plaintiff's economic loss | |

| Rule 10b-5, Defendant Omitted a Material Fact | |
|---|---|
| 1.  Content of the statement(s) that was made | |
| 2.  Location of the statement(s) that was made—*i.e.,* the particular document or oral statement | |
| 3.  Person who made the statement(s) | |
| 4. Content of the statement(s) that should have been made but was not | |
| 5. How the omission misled investors | |
| 6. What the Defendant received as a result of the omission | |

| | |
|---|---|
| 7. Facts that create an inference that the Defendant acted with an intent to defraud or with severe recklessness | |
| 8. How Plaintiff relied on the statement (#1) that was made | |
| 9. The Plaintiff's economic loss | |
| 10. How the omission (#4) caused the Plaintiff's economic loss | |

Pirani fails to plead any of these required facts with specificity in Counts I and II. Instead, he starts each count by adopting his earlier statement of facts, *see* AC ¶¶ 203 (Count I), 218 (Count II), then he alleges in conclusory fashion that Defendants acted in a way that would meet all of the requisite elements. *See* AC ¶¶ 204-217 (Count I); 219-229 (Count II). Pirani's conclusory pleading leaves Defendants and the court to guess his precise theory of liability under Rule 10b-5. For example, what precisely should MPT have said earlier; when and where should MPT have made that precise statement; and how did MPT's failure to make that precise statement earlier cause MPW's stock price to drop more steeply in February 2023 than it would have immediately after MPT made the earlier statement? (After all, if Pirani is right that impairment charges diminish trade value, MPW's value would have fallen whenever MPT first disclosed the impairment.)

Because Pirani fails to meet the triple-layered pleading standard on multiple facts, the court will **grant** Defendants' motion to dismiss both counts for failing to plead facts that would entitle Pirani to relief.

—

The next question is whether to give Pirani another chance to plead his complaint and fill in all the blanks the court highlights above. Defendants argue that Pirani's effort would be futile for several reasons. The court agrees with (at least) one: Pirani cannot plead facts that link MPT's alleged omissions to the drop in MPW's trade value from February 23 to March 1, 2023.

**B. Inability to Prove Loss Causation**

To prove causation for his Rule 10b-5 claim and his §20(a) claim, Pirani must offer "proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." *Meyer*, 710 F.3d at 1195; *see also* 15 U.S.C. § 78u-4(b)(4) (requiring proof that the misrepresentation "caused the loss for which the plaintiff seeks to recover). Pirani pleads "fraud-on-the-market" to make this causal link. *See* (AC ¶¶ 177-189).

1. *Fraud-on-the-market*: Here's what that means: Pirani relied on the market's knowledge of MPW's value, rather than his own knowledge and research. When Pirani bought MPW stock, the market overvalued MPW because the market did not know about (a) Prospect's financial troubles and (b) MPT's efforts to help Prospect pay rent because of those troubles—techniques Viceroy called "uncommercial transactions." When the market discovered this information, the market corrected by devaluing MPW, thereby causing Pirani's stock to lose value. *See Meyer*, 710 F.3d at 1195 ("[I]n a fraud-on-the-market case, the plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the security's value but also that 'the fraud-induced inflation that was baked into the plaintiff's purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff.'"). The revelation of the MPT's false statement or omission to the market is called the "corrective disclosure." *Id*. at 1196.

The fraud-on-the-market theory hinges on an "efficient market" that immediately digests and incorporates "all publicly available information about a security . . . in the market price of the security." *Id*. at 1197. "A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price. It follows that corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Id*. 1197-98 (cleaned up). "Because a corrective disclosure obviously must disclose new information," it dooms a Rule 10b-5 claim to plead a corrective disclosure that revealed information or sources that "were already public." *Id*. at 1198.

2. *Corrective disclosures*: Pirani pleads two corrective disclosures: the Viceroy Report and MPT's Form 8-K press release. *See* (AC ¶¶ 169-172). Neither is viable.

The Viceroy Report cannot serve as a viable corrective disclosure for three reasons. First, Pirani abandons the Viceroy Report as a corrective disclosure in his response to Defendants' motion to dismiss. (Doc. 33, pp. 37-38). Second, Viceroy merely repackaged quotes and information from MPT's public disclosures, *The Wall Street Journal*, Credit Suisse, the Rhode Island Attorney General, and others, in a doom-inducing tone—which, of course, is in a short-sellers' interest. *Meyer*, 710 F.3d at 1199 ("the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure"). Third, MPW's value *increased* after Viceroy released its report, which means Pirani could not prove that the Viceroy Report revelations injured him.[2]

Nor can MPT's February 23rd press release announcing the impairment serve as a viable corrective disclosure. MPT explained the impairment in the press release:

> "On the other hand, our initial outlook for this year contemplates a conservative scenario due to the underperformance of Prospect's Pennsylvania hospitals that we first communicated over a year ago, as well as the process by which we expect to recover our full investment in Prospect's Pennsylvania and Connecticut hospitals." . . .
>
> MPT plans to reallocate capital away from real estate leased to Prospect through the previously announced sale, predominantly for cash, of its Connecticut hospitals later this year, as well as by exercising lease provisions entitling it to the significant value embedded in Prospect's managed care platform. In order for this to occur, 12 to 18 months is necessary to allow for Prospect to recapitalize and prepare its managed care business for sale or recapitalization.

---

[2] According to NASDAQ.com, MPW opened at $12.39 on the day Viceroy released its report, January 26, 2023. MPW closed at $12.58 that day and closed higher than $12.39 every day until February 7, 2023, when it closed at $12.34.

Medical Properties Trust, Inc., Form 8-K, Exhibit 99.1, pp. 1-2. (Feb. 23, 2023).

As it said in the press release, MPT had talked publicly about Prospect's struggles in Pennsylvania, and its efforts and ideas on how to deal with those struggles, in 2022. For example, MPT reported the extra $100 million loan it gave Prospect in 2022, and Credit Suisse talked about that loan in its September 2022 credit report. (Doc. 30-13). When CFO Steven Hammer mentioned the $100 million loan during the Q3-2022 earnings conference call, he also mentioned that MPT was working on a "potential and confidential" transaction to avoid an impairment of Prospect properties:

> On our second quarter earnings call, we said that while we were unable to discuss certain potential and confidential Prospect transactions that we had reason to believe that such transactions would result in MPT's avoidance of material impairment or loss with respect to Prospect. We continue to be prohibited from disclosures about confidential discussions but we remain cautiously optimistic about repayment in the relatively near-term of the related second quarter $100 million increase in our original 2019 first lien mortgage loan. Of course, there is no assurance that any pending transactions, including possible repayments of mortgage loans in the near-term will occur.

(Doc. 34-1, p. 8). So MPT wasn't hiding the potential impairment.

Nor had MPT hidden Prospect's struggle to pay rent. Credit Suisse cited a potential "large rent deferral" in its September valuation of MPW. (Doc. 30-13, p. 5). MPT then disclosed that Prospect was having problems paying its rent in Pennsylvania in its Q3-2022 report, which Credit Suisse talked about in its December valuation. (Doc. 30-14). In that December report, Credit Suisse said that it had "recent conversations with management" about "Prospect's Pennsylvania assets," conversations that suggested to Credit Suisse that MPT would suffer earnings dilution. (*Id.*, p. 4).

Other analysts also asked MPT about Prospect's rent problems. Here, for example, was a question during MPT's Q3-2022 earnings call:

> Q: Okay. That's helpful. And then just on Prospect, obviously you now included additional assets in that calculation of coverage. So we're seeing the negative coverage is there. But can you just

> help us understand all the sources of capital that Prospect has and kind of your rent is current today? What are your – what's your confidence around that rent being current going forward?
>
> A: So that's a good question. So we included Pennsylvania in the coverage this time, and it's important to note that the California facilities continue to perform at acceptable levels. The Pennsylvania facilities are not where we would like them to be, certainly disappointed in where they are. I think that the changes or some of the changes that Prospect has going on at Pennsylvania is certainly in the right direction, haven't borne the fruit that we certainly would hope that they would at this particular time. But remember, they've got the managed care business, which is extremely profitable. That generates strong cash flow for them and as Steve pointed out earlier, there are potential transactions out there that we're not in a position where we can comment any further than that on that gives us comfort at this particular time. And we remained comfortable in the California facilities.

(*Id.*, p. 10).

The court could go on by citing Moody's, ProPublica, PESP, and others, *see supra*, pp. 4-9, but the point is made: When MPT announced that it recorded impairment charges based on Prospect's struggles to pay rent, the market already knew that (a) Prospect was struggling to pay MPT rent for the Pennsylvania properties, (b) an impairment of Prospect properties was possible, and (c) MPT had loaned Prospect an extra $100 million, and was considering other transactions, to help stave off an impairment.

3. *Analysis*: The court must assume that the market had digested and incorporated this information before February 23, 2023. *See Meyer*, 710 F.3d at 1197. But the court needn't just assume that the market incorporated its knowledge of Prospect's struggles into MPW's value; Credit Suisse dropped its target price for MPW in December 2022—three months before the February 23rd press release—in part to "account for loss of rents at the Pennsylvania assets leased to Prospect." (Doc. 30-14, p.2).

Because the February 23rd press release announced an impairment based on information already known and digested by the market, Pirani cannot rely on it to prove loss causation. *See Meyer*, 710 F.3d at 1198 ("Because a corrective disclosure 'obviously must disclose new information,' the fact that the sources used in the Einhorn Presentation were already public is fatal to the Investors' claim of loss causation."). To hold otherwise would subject companies to Rule 10b-5 lawsuits every time they record an impairment later than an investor believes they should have.

4. *Futility*: Pirani cannot fix this flaw by amending his complaint. Pirani bases his loss (and purported class members' losses) on MPW's drop in value from February 23, 2023, to March 1, 2023. (AC ¶¶ 13, 87). Pirani cannot plead around the fact that the market knew about Prospect's problems paying rent, and MPT's efforts to deal with Prospect's struggles to pay rent, before February 23, 2023.

—

To sum up, Pirani fails to plead facts that could establish loss causation for a Rule 10b-5 claim. Because both counts require Pirani to prove a Rule 10b-5 claim, the court will dismiss both counts. Because Pirani cannot replead his complaint to correct this deficiency, both dismissals will be with prejudice.

## CONCLUSION

For these reasons, the court will **GRANT** Defendants' motion to dismiss Pirani's Amended Complaint. The court will enter a separate order that (a) **DISMISSES WITH PREJUDICE** both counts and (b) closes this case.

**Done** and **Ordered** on September 26, 2024.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE